**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RICHARD LEVI, Derivatively on Behalf of Nominal Defendant U.S. BANCORP, | Case No. |
| Plaintiff, | |
| v. | |
| ANDREW CECERE, TERRY DOLAN, JODI RICHARD, KATHERINE QUINN, WARNER L. BAXTER, DOROTHY J. BRIDGES, ELIZABETH L. BUSE, KIMBERLY N. ELLISON-TAYLOR, KIMBERLY J. HARRIS, ROLAND A. HERNANDEZ, RICHARD P. MCKENNEY, YUSUF I. MEHDI, JOHN P. WIEHOFF, and SCOTT W. WINE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| U.S. BANCORP, | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ..................................................................................1

II.    JURISDICTION AND VENUE .............................................................................5

III.   PARTIES ...............................................................................................................5

   A.  Related Party Non-Defendants...........................................................................8

IV.    FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS....................................9

   A.  Additional Duties Of The Members Of The Audit Committee ............................9

   B.  Duties Of The Members Of The Public Responsibility Committee ...................14

   C.  Duties Of The Members Of The Risk Management Committee .........................15

   D.  Duties Under The Company's Code Of Ethics And Business Conduct .............17

   E.  Control, Access, And Authority........................................................................21

   F.  Reasonable And Prudent Supervision...............................................................21

V.     BREACHES OF DUTIES ....................................................................................22

VI.    SUBSTANTIVE ALLEGATIONS .......................................................................23

   A.  Background of the Company .............................................................................23

   B.  USB Promotes Its Trustworthiness, Reputation and Ethicality to Investors as
       Competitive Advantages that Help Bolster the Bank's Bottom Line ................24

   C.  USB Promotes Its "Best in Class" Risk Management Systems as Foundational to
       the Bank's Success............................................................................................26

   D.  The CFPB Issues a Consent Order Detailing that for More than a Decade USB
       Incentivized a Host of Unlawful Practices to Artificially Inflate Results..........27

   E.  Following the Wells Fargo Fake Accounts Scandal, Defendants Knew that USB's
       Business Conduct Was Illegal............................................................................30

   F.  In the Wake of the Wells Fargo Scandal, Defendant Cecere Faces Pressure to
       Improve USB's Growth Results and Cement its Industry- Leading Brand and
       Reputation .........................................................................................................33

   G.  In Response to Congress's Probe of USB's Unlawful Conduct, the Bank's CEO
       Admits Responsibility but Misleadingly Attempts to Downplay Its Significance ............35

H.  Defendants Failed to Adequately Disclose USB's Illegal Business Practices or the CFPB Investigation to Investors .......................................................................37

VII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE RELEVANT PERIOD .......................................................39

A.  Defendants' Misleading Statements and Material Omissions Regarding USB's Trust, Ethics and Brand.......................................................................................40

1. USB's September 12, 2019 Investor Day Conference.......................................40

2. 2019 and 2020 Annual Reports.......................................................................47

3. March 10, 2020 Proxy Statement....................................................................50

4. September 15, 2020, September 21, 2021 and December 8, 2021 Conferences ..............52

5. "Most Ethical Company" Statements ...............................................................53

6. USB's "Ethics" Website Statement ..................................................................59

B.  Defendants' Misleading Statements and Material Omissions Regarding USB's Risk Environment and Risk Management .................................................................61

C.  Defendants' False and Misleading Statements and Omissions Regarding the CFPB Investigation................................................................................................70

D.  Defendants' False and Misleading Statements and Omissions Regarding USB's Ethics Code .............................................................................................72

VIII.  THE TRUTH IS REVEALED ........................................................................................75

IX.  DEFENDANTS' INSIDER TRADING .........................................................................77

X.  USB'S STOCK REPURCHASES DURING THE RELEVANT PERIOD .....................78

XI.  DAMAGES TO THE COMPANY.................................................................................81

XII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................82

A.  Demand is Futile as to Defendant Cecere Because of His Principal Professional Occupation as the Company's President and CEO ...........................................83

B.  Demand is Futile as to Defendants Baxter, Buse, Ellison-Taylor, and Wine as Audit Committee Members.........................................................................84

C.  Demand is Futile as to Defendants Bridges, Ellison-Taylor, Mehdi, and Wiehoff as Public Responsibility Committee Members .......................................................86

D.   Demand is Futile as to Defendants Bridges, Cecere, McKenney, Mehdi, and Wiehoff as Risk Management Committee Members .......................................87

E.   Demand is Futile as to the Director Defendants For Additional Reasons .........................88

XIII.   COUNT I .......................................................................................92

XIV.   COUNT II ......................................................................................94

A.   More Allegations Regarding The Related Securities Action Defendants.........................97

B.   The Related Securities Action Defendants Are Control Persons .......................................98

XV.   COUNT III......................................................................................99

XVI.   COUNT IV....................................................................................100

XVII.   COUNT V.....................................................................................101

XVIII. COUNT VI.....................................................................................101

XIX.   PRAYER FOR RELIEF ........................................................................102

XX.   DEMAND FOR TRIAL BY JURY .............................................................103

By and through his undersigned counsel, Plaintiff Richard Levi ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant U.S. Bancorp ("USB" or the "Company") against its current and former officers and directors for: (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, as well as for contribution under Sections 10(b) and 21D of the Exchange Act; (ii) breaches of fiduciary duties; (iii) breach of fiduciary duty for insider trading; (iv) unjust enrichment; and (v) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings by USB and related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on USB's website; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *The Buhrke Family Revocable Trust v. USB, et al.*, Case No. 1:22-cv-09174 (S.D.N.Y) (the "Related Securities Action"); the U.S. Consumer Financial Protection Bureau's ("CFPB") proceedings against the Company's wholly owned banking subsidiary (*Bureau of Consumer Financial Protection v. U.S. Bank Nat'l Ass'n.*, No. 2022-CFPB-0006); and (e) review of other publicly-available information.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action derivatively for the benefit of Nominal Defendant USB against the Company's current and former executive officers and directors to recover the losses suffered by USB due to Defendants' breaches of fiduciary duties and Defendants publication of

false and misleading statements and/or omitting material information necessary to be stated so that the statements made would not be misleading in the Company's public filings and proxy statements from approximately August 1, 2019, to the present (the "Relevant Period").[1]

2.      USB is a Delaware corporation headquartered in Minneapolis, Minnesota. It provides a full range of financial services, including lending and depository services, cash management, capital markets, and trust and investment management services. It also engages in credit card services, merchant and ATM processing, mortgage banking, insurance, brokerage, and leasing. Its banking subsidiary, U.S. Bank National Association ("U.S. Bank"), is engaged in the general banking business, principally in domestic markets. USB is the publicly traded parent company of U.S. Bank.

3.      Throughout the Relevant Period, Defendants utterly failed to: (1) implement and maintain an adequate and effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain adequate and effective internal controls and corporate governance practices and procedures to oversee and monitor the internal controls and the material risks posed to the Company; (3) investigate and take action when presented with red flags of misconduct; and (4) made materially false and misleading statements regarding the Company's business, operational and compliance policies.

4.      Specifically, Defendants utter failures caused the making of false and/or misleading statements and/or failure to disclose that: (a) U.S. Bank created sales pressure on its employees that led them to open credit cards, lines of credit, and deposit accounts without

---

[1] The materially misleading statements and/or omissions were published in the Company's public filings with the SEC and in press releases from approximately August 1, 2019 to July 28, 2022; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

consumers' knowledge and consent; (b) since at least 2015, U.S. Bank and its parent were aware of such unauthorized conduct and that this misconduct violated relevant regulations and laws aimed at protecting consumers; (c) USB's Board of Directors (the "Board") failed to properly maintain internal controls to monitor its employees from engaging in such unlawful conduct, detect and stop the misconduct, and identify and remediate harmed consumers; (d) all the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny or investigation; (e) USB's revenues were in part the product of unlawful conduct and thus unsustainable; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times and the Defendants breached their fiduciary duties to USB.

5.      In addition to the above, during the Relevant Period, as the false and misleading statements resulted in the Company's stock becoming artificially inflated, certain of the Defendants, while in the possession of material non-public information sold 463,700 shares of their personally-held stock, reaping $26 million in ill-gotten gains.

6.      Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Disney to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between August 2019 and July 2022, approximately 107 million shares of USB common stock were repurchased, costing the Company approximately $6.032 billion. As the Company's stock was actually worth much less per share, Company overpaid for the repurchases of its own stock.

7.      On July 28, 2022, the truth was revealed when the CFPB issued a Consent Order and fined U.S. Bank $37.5 million for illegally exploiting consumers' personal data to open sham accounts for unsuspecting customers in violation of the Consumer Financial Protection Act of 2010 ("CFPA"), the Truth in Lending Act ("TILA"), the Truth in Savings Act ("TISA"), and

the Fair Credit Reporting Act ("FCRA"). In that connection, CFPB Director Rohit Chopra declared that "'[f]or over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts.'" Furthermore, the CFPB investigation found "specific evidence that revealed that U.S. Bank was aware that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts." The price of USB stock declined 4% to close at $46.12 on July 28, 2022.

8.      One week later, the Senate Committee on Banking, Housing, and Urban Affairs (the "Senate Banking Committee") sent a letter to Andrew Cecere ("Cecere"), Chairman of USB's Board, its President, and Chief Executive Officer ("CEO") about the Company's "concerning" misconduct coming on the heels of the Wells Fargo fake accounts scandal. The Committee highlighted the CFPB's findings that U.S. Bank utilized an incentive compensation program to pressure employees to "engage[] in unlawful activity by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit," which "accrued fees and increased profits" for USB, which the CFPB found "violated federal consumer laws and violated individual consumers' control over their data privacy." At the Annual Wall Street Oversight Hearing by the Senate Banking Committee in September 2022, when Cecere appeared before Congress, he admitted to the shameful and wrongful conduct of USB and its employees: "I take full responsibility that we did open up unauthorized bank accounts. It was going back to 2010. It's unacceptable. It's inconsistent with our principles and procedures as well as our ethics."

9.      As a result of Defendants' wrongful acts and omissions and breaches of fiduciary duties, the investigations undertaken and fines imposed by regulators, the filing (and ultimate

4

resolution) of the Related Securities Action, the decline in the market value of USB's securities, the Company has suffered and continues to suffer significant damage and injury to its reputation and goodwill.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

11.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's federal claims.

12.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## III.    PARTIES

13.    Plaintiff has been a shareholder since prior to the start of the Relevant Period, is currently, and at all relevant times has been, a holder of USB's common stock.

14.    Nominal Defendant USB is incorporated in Delaware and its current principal executive offices are located at 800 Nicollet Mall, Minneapolis, Minnesota 55402. USB is the publicly traded parent company of U.S. Bank and its shares trade on the NYSE under the ticker symbol "USB."

15.    Defendant Cecere is USB's President since January 2016, a member of its Board since 2017, CEO since April 2017, and Chairman of its Board since April 2018. He is a member of its Risk Management Committee. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Cecere received $18,785,026, $16,752,753, $19,166,276, and $16,157,514 in total compensation, respectively. Defendant Cecere is a named defendant in the Related Securities Action.

16.    Defendant Terry Dolan ("Dolan") has been the Company's Vice Chair since April 2010 and Chief Financial Officer ("CFO") since December 2016. Dolan certified the Company's Forms 10-Q and signed and certified the Forms 10-K filed with the SEC during the Relevant Period. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Dolan received $6,511,517, $6,586,238, $7,159,658, and $6,828,538 in total compensation, respectively. Defendant Dolan is a named defendant in the Related Securities Action.

17.    Defendant Jodi Richard ("Richard") has been the Company's Vice Chair and Chief Risk Officer since October 2018. Defendant Richard is a named defendant in the Related Securities Action.

18.    Defendant Katherine Quinn ("Quinn") is Vice Chair and Chief Administrative Officer of USB since April 2017. Quinn also served in various roles at USB, including as Executive Vice President and Chief Strategy, Marketing and/or Reputation Officer, from September 2013 to April 2017, and has served on the Managing Committee since 2015. Defendant Quinn is a named defendant in the Related Securities Action.

19.    Defendants Cecere, Dolan, Richard, and Quinn are collectively referred to herein as the "Securities Action Defendants."

6

20.    Defendant Warner L. Baxter ("Baxter") is a USB Board member since December 2015 and Chair of its Audit Committee. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Baxter received $305,980, $226,151, $279,500, and $306,026 in total compensation, respectively.

21.    Defendant Dorothy J. Bridges ("Bridges") is a member of the USB Board since October 2018, Chair of its Public Responsibility Committee, and a member of its Risk Management Committee. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Bridges received $283,980, $235,151, $304,500, and $304,526 in total compensation, respectively.

22.    Defendant Elizabeth L. Buse ("Buse") is a member of the USB Board since June 2018 and a member of its Audit Committee. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Buse received $287,980, $239,651, $284,000, and $285,526 in total compensation, respectively.

23.    Defendant Kimberly N. Ellison-Taylor ("Ellison-Taylor") is a member of the USB Board since January 2021, member of its Audit Committee, and a member of its Public Responsibility Committee. For the fiscal years of 2021 and 2022, Defendant Ellison-Taylor received $316,433 and $282,026 in total compensation, respectively.

24.    Defendant Kimberly J. Harris ("Harris") is a member of the USB Board since October 2014. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Harris received $286,480, $237,651, $289,500, and $289,526 in total compensation, respectively.

25.    Defendant Roland A. Hernandez ("Hernandez") is a member of the USB Board since January 2012. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Hernandez received $304,480, $251,151, $289,500, and $289,526 in total compensation, respectively.

26.     Defendant Richard P. McKenney ("McKenney") is a member of the USB Board since October 2017 and Chair of its Risk Management Committee. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant McKenney received $315,480, $260,151, $320,500, and $312,526 in total compensation, respectively.

27.     Defendant Yusuf I. Mehdi ("Mehdi") is a member of the USB Board since June 2018, a member of its Public Responsibility Committee, and a member of its Risk management Committee. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Mehdi received $283,980, $232,151, $299,500, and $299,526 in total compensation, respectively.

28.     Defendant John P. Wiehoff ("Wiehoff") is a member of the USB Board since January 2020, a member of its Public Responsibility Committee, and a member of its Risk management Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Wiehoff received $317,827, $279,500, and $281,026 in total compensation.

29.     Defendant Scott W. Wine ("Wine") is a member of the USB Board since July 2014 and a member of its Audit Committee. For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Wine received $304,480, $251,151, $304,500, and $306,026 in total compensation.

30.     Defendants Baxter, Bridges, Buse, Ellison-Taylor, Harris, Hernandez, Kirtley, McKenney, Mehdi, Wiehoff, and Wine are collectively referred to herein as the "Director Defendants."

31.     The Director Defendants, along with the Related Securities Action Defendants, are collectively referred to herein as the "Individual Defendants."

32.     Nominal Defendant USB, along with the Individual Defendants are collectively referred to herein as the "Defendants."

**A.     Related Party Non-Defendants**

8

33.     Alan B. Colberg ("Colberg") is a member of the USB Board since January 2023. Colberg is named solely for purposes of demand futility.

34.     Loretta E. Reynolds ("Reynolds") is a member of the USB Board since October 2022. Reynolds is named solely for purposes of demand futility.

## IV.   FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers, directors, and/or fiduciaries of USB, and because of their ability to control the business and corporate affairs of USB, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage USB in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of USB and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.     Each director and officer of the Company owes to USB and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

37.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### A.  Additional Duties Of The Members Of The Audit Committee

38.    Pursuant to the Audit Committee Charter of USB (adopted as of January 2022)[2],

the purpose of the Audit Committee is to:

> [P]rovide assistance to the Board of Directors in fulfilling its responsibility to the shareholders, potential shareholders, investment community and bank regulatory agencies with respect to its oversight of:
>
> (i)    The quality and integrity of the Company's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including matters relating to its accounting, financial reporting, and internal controls;
>
> (ii)    The Company's compliance with legal and regulatory requirements;
>
> (iii)    The independent registered public accounting firm's ("independent auditor's") qualifications and independence; and
>
> (iv)    The activities and performance of the Company's internal audit function and independent auditors.
>
> In addition, the Committee (i) reviews and approves the report that Securities and Exchange Commission ("SEC") rules require be included in the Parent's annual proxy statement, (ii) performs the audit committee functions specified by 12 C.F.R. Part 363 for the Bank and any other depository institution subsidiary of the Company that does not have its own audit committee, and (iii) performs the functions of a fiduciary audit or similar committee for any subsidiary of the Company exercising fiduciary powers that does not have its own audit committee, including serving as the fiduciary audit committee required by 12 C.F.R. § 9.9 for the Bank, in each case to the extent permitted, and in the manner required, by applicable laws and regulations.

39.    Specifically, the Audit Committee has the following responsibilities, among

others:

> Documents/Reports Review
>
> • Review and discuss with management and the independent auditors, prior to public dissemination, the Parent's annual audited financial statements and quarterly financial statements, including the Parent's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discuss with the independent auditors the matters required to be discussed by Public Company Accounting Oversight Board Auditing

---

[2] Available at https://ir.usbank.com/static-files/f83aaa83-99ea-4574-a5bf-05695db51e47.

Standard "Communication with Audit Committees" and other professional auditing standards, and recommend to the Board whether the audited financial statements should be included in the Parent's Form 10-K.

- Review and discuss with management and the independent auditors the financial results communicated in the Parent's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information), as well as any other financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), and each earnings release or instance in which the Parent provides earnings guidance need not be discussed in advance.

- Perform any functions required to be performed by it or otherwise appropriate under applicable law, rules or regulations, by the Company's by-laws and the resolutions or other directives of the Board, including review of any certification required to be reviewed in accordance with applicable law or regulations of the SEC; review of disclosures made to the Committee by the Parent's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data or material weaknesses in internal controls over financial reporting and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls over financial reporting; and review of any changes in the Company's internal controls over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal controls.

- Review and discuss with management (including the Chief Audit Executive) and the independent auditor the Company's internal controls report and the independent auditor's attestation of the report prior to its inclusion in the filing of the Parent's Annual Report on Form 10-K.

* * *

Financial Reporting Process

- In consultation with the independent auditors, management and the internal auditors, periodically review the integrity of the Company's financial reporting processes relied upon to prepare SEC or other regulatory filings. In that review, the Committee should obtain and discuss with management and the independent auditor quarterly reports from management and the independent auditor regarding: (i) critical accounting policies and practices used by the Company; (ii) analysis prepared by management and/or the independent auditor setting forth significant financial reporting issues and

11

judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor; (iii) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (iv) significant issues relating to the adequacy of the Company's internal controls and specific audit policies or procedures adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting; and (v) any other material written communications between the independent auditor and the Company's management, including any management letter or internal control letter and the Company's response to such letter or other disclosures as required by any applicable professional auditing standards.

- Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

* * *

Legal and Compliance Matters

- Review information from internal audit, management and the independent auditors, as appropriate, concerning the Company's compliance with applicable legal and regulatory requirements.

- Periodically review reporting on the effectiveness of the systems that management has established to implement the Company's ethics guidelines, including the reporting and resolution of ethics concerns, ethics education and awareness initiatives, and employees' compliance with the Company's Code of Ethics.

- Taking into consideration the Board's assignment of primary responsibility for oversight of operational risk management to the Risk Management Committee:

    a. Discuss with management and the independent auditors the Company's key guidelines and policies with respect to risk assessment and risk management. Discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

    b. Review periodically, with the Company's legal counsel, any legal matter that could have a significant impact on the Company's financial statements or the effectiveness of the Company's control environment.

12

    c.   Review periodically, with the Company's Chief Risk Officer, any regulatory, risk or compliance matter that could have a significant impact on the Company's financial statements or the effectiveness of the Company's control environment.

    d.   Review significant findings with respect to the credit process arising out of credit risk management exams and the status of management's response to any noted issues.

* * *

- Establish and review annually, policy and procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls or auditing matters and (ii) the confidential, anonymous submission by employees of the listed issuer of concerns regarding questionable accounting, internal controls, or auditing matters.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies, and receive summaries of corrective action plans and timetables.

- Meet with regulators when deemed necessary or appropriate by the Committee, or when requested by regulators.

<u>Reports</u>

- Prepare all reports of the Committee required to be included in the Parent's annual proxy statement, pursuant to and in accordance with applicable rules and regulations of the SEC.

- Report regularly to the full Board of Directors on:

    i.   any issues that arise with respect to the quality or integrity of the Company's financial statements, application of accounting principles, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function;

    ii.   the significant matters addressed at all meetings of the Committee, including the Committee's conclusions following its annual review of the performance of the independent auditor; and

13

iii.    such other significant matters as are relevant to the Committee's discharge of its responsibilities.

* * *

Internal Audit

* * *

- Review quarterly the internal audit activity's risk assessment of the Company and any significant changes to the risk assessment.

- Review quarterly with management, the internal auditors and the independent auditors their assessments of the adequacy of internal controls and the status of resolution of any identified material weaknesses or reportable conditions.

* * *

- Review at least annually the results of the Quality Assurance and Improvement Program, including Internal Audit's:

    a.    Self-assessment against internal audit international standards
    b.    Self-assessment against applicable laws and regulations
    c.    External assessments of the internal audit function

40.    Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the members of the Audit Committee, as those set forth above.

**B.    Duties Of The Members Of The Public Responsibility Committee**

41.    Pursuant to the Public Responsibility Committee Charter of USB (adopted as of January 2023)[3], the purpose of the Public Responsibility Committee is to:

[R]eview and consider the Company's position and practices on matters of public interest and public responsibility and similar issues involving the Company's relationship with the community at large, including its culture and reputation, and provide guidance to management and the Board as appropriate.

42.    Specifically, the Public Responsibility Committee has the following responsibilities, among others:

---

[3] Available at https://ir.usbank.com/static-files/a3209d86-5256-4229-91f2-4de246ffa56d.

14

- Oversee the Company's management of reputation risk, and review the Company's reputation and brand management activities.

* * *

- Annually review the Company's fair and responsible banking activities and performance.

* * *

- Review public policy matters that may significantly affect the Company's business activities, financial performance or reputation, and management's evaluation of, and any response to, those matters.

* * *

- Provide regular reports of its activities to the Board.

43.    Upon information and belief, the Company maintained versions of the Public Responsibility Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the members of the Public Responsibility Committee, as those set forth above.

**C.    Duties Of The Members Of The Risk Management Committee**

44.    Pursuant to the Risk Management Committee Charter of USB (adopted as of January 2022)[4], the purpose of the Risk Management Committee is to:

> [P]rovide oversight of the operation of the Company's global risk management framework, which governs the management of credit risk, interest rate risk, liquidity risk, market risk, operational risk, compliance risk, strategic risk, reputation risk, Bank Secrecy Act/Economic Sanctions/Anti-Bribery/Anti-Corruption risk and other key risks faced by the Company.

45.    Specifically, the Risk Management Committee has the following responsibilities, among others:

> In exercising its oversight responsibilities, the Committee will question, challenge, and when necessary, oppose recommendations and decisions made by management that could cause the Company's risk profile to exceed its risk

---

[4] Available at https://ir.usbank.com/static-files/3add9d69-072e-4036-9f25-6f04679bf57c.

appetite or jeopardize the safety and soundness of the Bank or any other of the Company's bank subsidiaries.

*        *        *

**A.  With respect to its oversight of the Company's global risk management framework, the Committee will:**

- Annually review and approve the Company's Risk Management Framework. Periodically review the effectiveness of, approve significant changes to and monitor compliance with the Risk Management Framework.

- Annually review and approve the Company's risk appetite statement, or more frequently based upon the size and volatility of risks and any material changes in the Company's business model, strategy or risk profile or in market conditions.

- Review and approve key risk management policies of the Company's global operations.

* * *

- Review quarterly reports of the monitoring by independent risk management of the Company's risk profile relative to its risk appetite and compliance with risk limits, and more frequently as appropriate.

- Review quarterly reports on regulatory examination results and management's actions and timing to remediate issues. Review summary and trending reports on open audit, second and first line self-identified issues, including those issues that have been extended or are past due.

* * *

**D.  With respect to its operational and compliance risk oversight function, the Committee will:**

- Review and approve significant Compliance, Operational Risk and BSA/AML Policies.

- Oversee the Company's compliance with regulatory requirements, including, but not limited to, those relating to Bank Secrecy Act/Economic Sanctions/Anti-Bribery/Anti-Corruption, Retail Non-Deposit Investment Products, fiduciary activities conducted in accordance with 12 C.F.R. part 9, and bank security (in accordance with the Bank Protection Act).

16

- Review reports from management on the Company's Compliance, Operational and BSA/AML risk programs, including a record of suspicious activity reports (SARs) filed by U.S. Bank National Association.

* * *

- Oversee the development, implementation and maintenance of the Company's information security program, including cybersecurity, with annual review and approval of the Company's information security program and report. Review significant information security matters and management's actions to address identified weaknesses.

* * *

- At least annually, review significant legal and regulatory matters with the Company's General Counsel, including remediation plans and progress reports if applicable.

**E. With respect to its Independent Risk Review oversight function, the Committee will:**

- Review and approve the annual Independent Risk Review plans, which include Credit Risk Review, Financial Risk Review, and Compliance Quality Assurance.

- Review the quarterly Independent Risk Review exam results, including Credit Risk Review, Financial Risk Review, and Compliance Quality Assurance for progress against the plans and the status of management's actions to address significant recommendations.

46.    Upon information and belief, the Company maintained versions of the Risk Management Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the members of the Risk Management Committee, as those set forth above.

**D.    Duties Under The Company's Code Of Ethics And Business Conduct**

47.    The Individual Defendants, as officers and/or directors of USB, were also bound by the Company's Code of Ethics and Business Conduct (the "Code")[5] which, according to the

---

[5] Available at https://www.usbank.com/content/dam/usbank/documents/pdf/coe/coe

Code, sets out basic principles to guide all directors, officers, and employees of USB, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

48.    Regarding maintaining a strong ethical culture, the Code requires:

- Understanding and complying with our Code of Ethics and Business Conduct.

- Following the letter and spirit of all laws and regulations and all company policies and procedures.

- Treating employees, customers and business partners with respect.

- Being clear, truthful, fair, transparent, responsible and accurate with all stakeholders, including customers, regulators, third parties, shareholders, internal and external auditors, the board of directors and other employees.

- Providing prompt, complete and accurate information to banking regulators and auditors according to applicable regulations, policies and procedures, and cooperating fully with banking regulators and auditors.

- Protecting our customers from harm. This includes protecting their information and privacy and protecting them from unlawful discrimination and unfair, deceptive or abusive acts or practices.

- Protecting our reputation as a safe and trusted financial institution.

- Speaking up to report concerns and violations. . . This includes potential violations or significant compliance failures as described in the USB Enterprise Compliance Program Policy. It also includes reporting suspected or actual violations of audit or internal control matters and disclosure obligations, as described in the USB Unethical Conduct Escalation, Investigation and Reporting Policy.

- Cooperating with investigations.

- Completing required and/or assigned training and associated certifications (for example, ethics and compliance training, among other topics) successfully and on time.

49.    Regarding respecting customers and adherence to banking laws, the Code states:

**Respecting our customers**

---

Handbook.pdf.

We treat our customers professionally and with respect, and we put their best interests at the center of everything we do.

**Fair and responsible banking laws**

We do business in a fair and responsible manner, and we expect the same from our business partners. This commitment guides the ways we offer financial products and services and conduct activities throughout the entire customer relationship and product lifecycle. This enables us to:
Prevent unlawful discriminatory practices.
Prevent harm to our customers.
Avoid unfair, deceptive or abusive acts or practices (collectively called "UDAAP").
Ensure compliance with all applicable fair lending and responsible banking laws and regulations.

**Responsible marketing, sales and servicing activities**

We're proud to offer our customers the best products and services available to meet their diverse needs. We design fair and responsible products and services, and we market and advertise them in a fair and responsible way. We inform customers and potential customers about product and service options and we explain terms and features to help customers make informed decisions. We also provide service in a fair, responsible and consistent manner. We listen to customer feedback and monitor our servicing efforts, which include: handling inquiries and customer complaints; ensuring timely and accurate transaction, payment and data processing; and managing fee practices, collection activities, account resolution and property disposition. When we have an experience that doesn't meet our standards, may not comply with the letter or spirit of the law or may create undue risk for our customers, we act promptly to do the right thing. Sales always must be based on customer needs or requests—they should never be the result of pressuring customers into opening products or services to meet incentive, sales or recognition goals.

**Sales practices**

Internal gaming and aggressive, deceptive, unfair or abusive sales practices are prohibited. You may not manipulate records, open bogus accounts, sell products and/or open accounts without a customer's affirmative consent, falsify applications or skew results in any way for the benefit of yourself or other employees. Third parties also are prohibited from doing this in support of the company, our customers or potential customers.

50.    Regarding disclosures and retention of the Company's business and financial

records, the Code states:

**Records and filings**

As a U.S. publicly traded company, national bank, and global financial institution, we make filings with many government agencies, including the U.S. Securities and Exchange Commission (SEC), the U.S. Federal Reserve, the U.S. Office of the Comptroller of the Currency (OCC), the Central Bank of Ireland (CBOI), the Canadian Office of the Superintendent of Financial Institutions (OSFI) and other global financial regulators. Our disclosures must be full, fair, accurate, timely and understandable. We have strict disclosure controls and procedures and stringent internal controls over financial reporting. If you're involved in preparing our public disclosures, you have a special responsibility to help us meet these standards.

Each one of us is responsible for ensuring the information we record, process and analyze is:

- Complete, accurate and recorded in a timely manner.
- Handled according to applicable accounting standards, legal requirements, and internal controls.
- Corrected immediately if errors occur.

**Reporting concerns**

You have the right—and the obligation—to report possible violations of accounting, audit or internal control matters, disclosure obligations, laws and company policies without fear of discrimination, retaliation, threats or harassment. . . Complaints alleging accounting matters, securities or commodities trading law violations or violations of our Anti-bribery and Anti-corruption Policy should be reported to the Global Ethics Office immediately.

**Record retention and legal hold policies**

We maintain certain records to meet legal, tax and regulatory requirements. You're responsible for retaining records as described by our corporate record retention schedule, understanding, and complying with our Legal Records Hold policy and completing training on this topic as required.

51.    Upon information and belief, the Company maintained versions of the Code

during the Relevant Period that imposed the same, or substantially and materially the same or

similar, duties on, among others, the Individual Defendants, as those set forth above.

### E. Control, Access, And Authority

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of USB, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by USB.

53.     Because of their advisory, executive, managerial, and directorial positions with USB, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of USB.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of USB and was at all times acting within the course and scope of such agency.

### F. Reasonable And Prudent Supervision

55.     To discharge their duties, the officers and directors of USB were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of USB were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how USB conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that USB was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.    BREACHES OF DUTIES

56.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to USB and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of USB, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of USB, the absence of good faith on their part, and a reckless disregard for their duties to USB and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to USB.

57.    The Individual Defendants each breached their duties of loyalty and good faith by failing to: (1) implement and maintain an adequate and effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain adequate and effective internal controls and corporate governance practices and

procedures to oversee and monitor the internal controls and the material risks posed to the Company; (3) investigate and take action when presented with red flags of misconduct; and (4) made materially false and misleading statements regarding the Company's business, operational and compliance policies that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

58.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct and the investigations undertaken and fines imposed by regulators, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, USB has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI.    SUBSTANTIVE ALLEGATIONS
### A.  Background of the Company

59.    Founded in 1863, USB is a Delaware company headquartered in Minneapolis, Minnesota. With nearly 77,000 employees and $675 billion in assets, USB is the fifth largest bank in the U.S. It operates more than 2,000 banking branches across the country, and offers and provides an array of financial products and services to consumers, including lending and depository services, cash management, capital markets and trust and investment management services. It also engages in credit card services, merchant and ATM processing, mortgage banking, insurance, brokerage and leasing. The Company trades on the NYSE under the ticker "USB." USB is the publicly traded parent company of U.S. Bank, which is engaged in the general banking business, principally in domestic markets. Consumer and business banking is the Bank's largest business unit –generating 40% of the Company's net revenue, the vast majority of which is derived specifically from consumer banking.

60.    While USB had historically been one of the industry's best performers – including by weathering the financial crisis better than most of its competitors – the Bank was "far from a universally recognized brand" to consumers, as noted in an October 3, 2017 *American Banker* article. In fact, defendant Cecere had once referred to USB as "the best bank no one's heard of," according to the article. But in 2013, the Bank hired defendant Quinn to run the Company's strategy, marketing, reputation and branding efforts, who was tasked with "build[ing] the brand from the ground up." According to one report, when a recruiter first told Quinn about the job opportunity at the Bank, she responded that she too had "never heard of U.S. Bank," to which the recruiter responded, "[t]hat's exactly why they need you." Over the ensuing years, under the leadership of Cecere and Quinn, among others, and in response to USB's "efforts to build brand awareness and strategically market [itself]," the Company's "brand value — the financial significance a brand carries — grew by 55%" from 2017 to 2019. A crucial part of those efforts included seeking and obtaining an annual designation by Ethisphere Institute as one of the world's "Most Ethical Companies," an honor the Company heavily promotes to investors. As recognized by USB, Quinn has "advanced the company strategically and reputationally," and has "built U.S. Bank into a national brand, including . . . the positioning of U.S. Bank as one of the world's most ethical companies."

B.    **USB Promotes Its Trustworthiness, Reputation and Ethicality to Investors as Competitive Advantages that Help Bolster the Bank's Bottom Line**

61.    Essential to USB's success is the success of its consumer banking operations and its ability to garner the trust of customers. As defendant Cecere – USB's Chairman, President and CEO – highlighted in a "Strategic Overview" presentation at a September 12, 2019 Investor Day conference (the "2019 Investor Conference"), one of the Company's key "*[a]dvantages*" is

a "***strong reputation rooted in trust.***" In the same presentation, Cecere remarked that USB's "***reputation***" is a "***differentiator***[]," and that "[c]ustomers and employees remain at the center of everything we do – past, present and future." Quinn, then the Company's Chief Administrative Officer, echoed these sentiments in her presentation at the 2019 Investor Conference, stating that USB's "brand and culture" – including "***trust***," "***ethics***" and "***customer transparency***" – were a "***source of competitive advantage***," and that "Trust and Reputation are Foundational to All Constituencies." Indeed, she emphasized in her slide deck that USB's brand "directly impacts every major constituency," including employees, customers communities and ***shareholders***. She also stated that USB experienced 55% "[g]rowth in brand value since 2016" – the same year that the Wells Fargo scandal erupted publicly. The Bank later explained that its brand value growth was in direct "response to [the Bank's] efforts to build brand awareness and strategically market ourselves." Quinn continued in her comments accompanying the slide presentation:

> We were at a leadership off-site this past summer and we asked our top 200 leaders what is the ***secret sauce*** of U.S. Bank, and this is the word cloud that emerged from that. So for those of us who live and breathe it every day, it's no surprise that ***ethics, trust and collaboration rose to the top***.

>               *         *         *

> ***Ethics and trust rises to the #1 spot*** for all customer segments, both consumers and businesses.

>               *         *         *

> ***Trust will remain a competitive advantage for us***. It is not going anywhere. It is going to be a foundational driver, top driver of business in our industry.[6]

62.    USB touted these same fundamental attributes and distinguishing characteristics in the Company's 2019 Annual Report, which again highlighted USB's "strong reputation" and

---

[6] Unless otherwise stated, all emphasis is added.

growth in brand value alongside a declaration that "[o]ur culture, brand and reputations are sources of **competitive advantage** for U.S. Bank and **differentiate** us from our peers."

63.    Trust and reputation are so important to USB that its executives have repeatedly promoted the Company's selection as one of the "**World's Most Ethical Companies**" on its website, at investor conferences, and in its annual reports, press releases, SEC filings and USB's Code. When the Company announced the honor for the sixth consecutive year in February 2020, defendant Cecere stated that, "**Our commitment to doing the right thing is at the heart of everything we do** . . . I'm proud of the work our employees do every day to earn and keep the trust of our customers." Indeed – unlike the other major banks implicated in fraudulent account scandals, at the end of nearly every press release the Company issued during the Relevant Period, under the heading "About USB," USB highlighted that it was named one of the "World's Most Ethical Companies," cementing its "statistically leading" reputation among the Bank's peers. And USB's 2019 Annual Report highlighted its designation as one of the "World's Most Ethical Companies" not once, but **three times** on the **very first page** of the report. Thus, the Bank ensured that its ethicality, reputational assets and ability to maintain consumer trust and confidence were of paramount importance and a centerpiece of the Bank's business, financial prospects and its value proposition for USB investors.

**C.    USB Promotes Its "Best in Class" Risk Management Systems as Foundational to the Bank's Success**

64.    Defendants also promoted USB's risk management systems – built to manage operational risk embedded in the Bank's business activities through a system of controls and oversight designed to safeguard financial and other customer data – as a critical component of USB's success. For example, at the 2019 Investor Conference, defendant Cecere described the

26

Company's "[b]est-in-class . . . risk management" as one of the Bank's key "*advantages*," and proclaimed that USB's "risk and financial discipline," along with its "business mix" and "culture," is "what made us great." He also stated in a slide during the presentation that the Bank's "risk discipline" is a "*differentiator*[]." Another executive touted USB's "[b]est in class risk discipline" at the conference as a "*competitive advantage*," while yet another executive emphasized that "[a] strong risk culture is embedded in our corporate strategy and will continue to be foundational to our long-term success." The marketplace agreed with USB's assessment. For example, Wells Fargo opined in an analyst report at the end of the Relevant Period that "USB has, in our view, one of the stronger reputations in banking in terms of risk management and oversight."

### D.    The CFPB Issues a Consent Order Detailing that for More than a Decade USB Incentivized a Host of Unlawful Practices to Artificially Inflate Results

65.    Explicitly and directly repudiating the Bank's repeated proclamation of ethicality and trustworthiness, and that it maintained "best-in-class . . . risk management" systems, on July 28, 2022, the CFPB issued a Consent Order fining the bank $37.5 million for "*Illegally Exploiting* Personal Data to Open Sham Accounts for Unsuspecting Customers." In the press release issued that day, the CFPB explained that U.S. Bank:

> *illegally* access[ed] its customers' credit reports and open[ed] checking and savings accounts, credit cards, and lines of credit without customers' permission. U.S. Bank pressured and incentivized its employees to sell multiple products and services to its customers, including imposing sales goals as part of their employees' job requirements. In response, U.S. Bank employees unlawfully accessed customers' credit reports and sensitive personal data to apply for and open unauthorized accounts. U.S. Bank must make harmed customers whole and pay a $37.5 million penalty.

27

66.    CFPB Director Rohit Chopra stated that "'[f]or over a decade, *U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts.'*" The CFPB further described its findings as follows:

The CFPB's investigation found *specific evidence* that revealed that U.S. Bank was *aware* that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts. Specifically, U.S. Bank imposed sales goals on bank employees as part of their job requirements. U.S. Bank also implemented sales campaigns and an incentive-compensation program that financially rewarded employees for selling bank products.

U.S. Bank's conduct harmed its customers in the form of unwanted accounts, negative effects on their credit profiles, and the loss of control over personally identifiable information. Customers also had to waste time and energy closing unauthorized accounts and resolving consequences stemming from them, including seeking refunds for improperly charged fees.

The CFPB found that *U.S. Bank violated the Consumer Financial Protection Act, the Fair Credit Reporting Act, the Truth in Lending Act, and the Truth in Savings Act*. Specifically, U.S. Bank was:

- **Exploiting personal data without authorization**: The Fair Credit Reporting Act, among other things, defines the permissible uses of credit reports, and users of credit reports may only request them if they have a permissible purpose. U.S. Bank used customers' credit reports without a permissible purpose, and without its customers' permission, to facilitate opening unauthorized credit cards and lines of credit.

- **Opening accounts without consumer permission**: U.S. Bank opened deposit accounts, credit cards, and lines of credit without permission. This included opening Reserve and Premier lines of credit, which carry high interest rates and expensive fees. This behavior violated the Consumer Financial Protection Act and the Truth in Lending Act.

- **Failing to provide legally required consumer disclosures**: The Truth in Savings Act requires banks to provide certain disclosures when opening new deposit accounts. U.S. Bank violated the law when its employees opened consumer deposit accounts without permission and, in the process of doing so, failed to provide the required disclosures.

67.    The Consent Order itself explained that in order to increase sales of consumer financial products or services, U.S. Bank "imposed sales goals on bank employees as a factor in

28

evaluating employee performance and implemented an incentive-compensation program that financially rewarded employees for selling" such products and services. The sales goals "included a point-based system, with different point values assigned to different products . . . primarily based on the revenue that each product generated for the bank." Bank employees were pressured "to sell more products" because, according to the Consent Order, doing so was in U.S. Bank's interest – namely increasing sales and related revenue associated with increased sales. In direct "response to sales pressure or to obtain incentive awards," bank employees opened accounts, submitted applications for and issued credits cards and opened lines of credit linked to deposit accounts "***without consumers' knowledge and consent***." The Consent Order also determined that these improper practices had "generated associated fees from products opened without consumers' knowledge and consent."

68.    Significantly, the Consent Order explained that from January 1, 2010 through December 31, 2020 (the "Findings Period"), the processes that U.S. Bank utilized "were not reasonably designed to determine the full scope of Improper Sales Acts or Practices." This is because prior to 2016, U.S. Bank "primarily relied on consumers to self-identify or on consumers or employees to allege improper activity." According to the Consent Order, U.S. Bank "***[o]nly recorded or investigated the allegations if the allegation was escalated above the bank-branch level,"*** and ***"was aware that many allegations were not escalated or recorded***." In other words, the Bank did not track or investigate instances of unauthorized accounts opened at all because it failed to maintain a system of controls designed to detect improper sales activity until, at the earliest, 2016, when U.S. Bank first "began enhancing its processes for detecting and investigating sales misconduct."

69.    U.S. Bank's improper and unlawful sales activity harmed consumers through "fees charged on unauthorized accounts; negative impacts to consumer credit profiles; the loss of control over personal identifying information; and the expenditure of consumer time and effort investigating the facts, seeking closure of unwanted accounts, and monitoring and mitigating harm going forward." The Consent Order required U.S. Bank to pay a $37.5 million penalty to the CFPB to be deposited into a victims relief fund to provide compensation to consumers harmed by violations of federal consumer financial protection law. The order also required U.S. Bank to forfeit and return all unlawfully charged fees and costs to harmed customers, including by developing a plan to remediate harmed consumers by returning all unlawfully charged fees and costs, plus interest.

**E.    Following the Wells Fargo Fake Accounts Scandal, Defendants Knew that USB's Business Conduct Was Illegal**

70.    The CFPB investigation into USB's unauthorized accounts occurred in the wake of the scandal that engulfed Wells Fargo. Referred to by former SEC Chairman Arthur Levitt as a "scandal of almost unimaginable proportions," the revelation that Wells Fargo employees had opened unauthorized accounts on behalf of customers resulted in the collapse of the price of Wells Fargo securities, a host of lawsuits, settlements and fines and the forced exit of several senior Wells Fargo executives, including its former CEO and Chairman John Stumpf. The Wells Fargo scandal would have been top-of-mind for Defendants when they made their misleading statements and omissions during the Relevant Period, knowing as they did that USB had also used a similar unauthorized-accounts scheme to illegally increase consumer sales and engagement for years and that the Bank was in extreme legal and regulatory peril as the target of a sweeping CFPB investigation.

71.    On September 8, 2016, the CFPB published an enforcement action and Consent Order against Wells Fargo. The CFPB, joined by other regulators, sought to punish Wells Fargo for its "***illegal*** practice of secretly opening unauthorized deposit and credit card accounts." The CFPB's announcement of the enforcement action noted that the underlying facts were known to Wells Fargo prior to the CFPB probe and that an internal investigation had revealed fraudulent practices. Specifically, the CFPB found that Wells Fargo had: (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts without the customers' knowledge or consent; (2) submitted applications for credit cards in customers' names without the customers' knowledge or consent; (3) enrolled customers in online banking services they did not request; and (4) ordered and activated debit cards using customers' information without their knowledge or consent.

72.    The CFPB's announcement also noted that Wells Fargo had "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking," and that "Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets." Then CFPB Director Richard Cordray remarked, "'***Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences***.'" As senior executives in the banking industry, this "notice" was directed at defendants Cecere, Dolan, Quinn and Richard, among other banking executives.

73.    Confirming the material risk posed by such illicit business practices to financial institutions like USB, as a result of the CFPB action the price of Wells Fargo stock dropped

$1.18 per share on Friday, September 9, 2016, from $49.90 to $48.72, and then continued dropping the following week.

74.    Following the filing of the CFPB action, a September 16, 2016 *Reuters* article reported that, "A phantom account scandal at Wells Fargo & Co. has put the U.S. bank's disclosure policies under a harsh spotlight." Under the heading "Material Or Not?" the *Reuters* article noted that, "The tactics deployed in its branches were not a surprise for Wells." The bank had been looking into them since 2011, but "[n]o mention is made of the bank's internal probe, or authorities' probes in the 'legal actions' section of [Wells Fargo's] latest quarterly or annual securities filings. . . . ***Experts said Wells Fargo would have been wise to at least flag the issue earlier***." The article also quoted former SEC Chairman Arthur Levitt saying, "It is a scandal of almost unimaginable proportions" and "'[y]ou cannot hold management immune from its consequences.'"

75.    Later in September 2016, Wells Fargo's CEO and Chairman, Stumpf, testified under oath before the Senate Banking Committee. During his testimony, Stumpf admitted that he and bank executives had been aware of unethical practices in the retail banking segment of Wells Fargo for several years prior to September 2016, as well as regulatory investigations into those unethical practices. But Stumpf tried to downplay the fake accounts scandal, claiming it "was not a material event" and that the bank just "had some indication that we had one percent of our people who were doing the wrong thing." But in response to Pennsylvania Senator Pat Toomey's question, "When did you begin to disclose in SEC filings that you had this potentially material adverse set of circumstances that could certainly have huge damage to your reputational value?," Stumpf said, "I do not know." Senator Toomey continued: "Well, we haven't been able to discover a disclosure, and ***the SEC very clearly requires disclosure of material adverse***

*circumstances. And I do not know how this could not be deemed 'material' . . . the reputational damage done to the bank is clearly material*."

76.    Two weeks after his Congressional testimony, Stumpf resigned as CEO and Chairman of Wells Fargo in disgrace and announced he would have to forfeit $41 million in previously awarded compensation. In January 2020, the Office of the Comptroller of Currency announced that Stumpf would be banned from ever working at a bank again and would pay $17.5 million for his role in the fake accounts scandal. Well Fargo ultimately paid billions in fines to various state and federal agencies, including the CFPB, the SEC, the Department of Justice, the U.S. Attorney's Offices for the Central District of California and the Western District of North Carolina and the city and county of Los Angeles, along with hundreds of millions to shareholders and account holders to resolve class action investor and consumer actions in connection with the scheme.

**F.    In the Wake of the Wells Fargo Scandal, Defendant Cecere Faces Pressure to Improve USB's Growth Results and Cement its Industry-Leading Brand and Reputation**

77.    In a February 21, 2017 exposé in *American Banker* discussing the upcoming transition from USB's then-Chairman and CEO Richard Davis to Andy Cecere, who was set to take over as head of the Bank in April 2017, a senior research analyst with Sanford C. Berstein commented, "'I can't imagine a more seamless transition'" given that "the two walk in lockstep on strategy and direction" and that "'Wall Street looks at them very much as a pair.'" While Davis was well-revered as the leader of the Company for a decade, the author commented that "it's rare to see a guy so clearly at the top of his game stepping aside at such an early age," and wrote that "[a] few have speculated that he witnessed the scandal engulfing his friend and

colleague, John Stumpf, the former chairman and CEO of Wells Fargo, and is getting out before something unexpected blows up." Of Cecere's upcoming challenges, the author noted that USB's "biggest issue . . . by all accounts" is growth-related as the Bank had "fallen short of expectations" and failed to "meet its three-year growth targets set in 2013." Accordingly, Cerere was poised to enter as CEO "under pressure to deliver better results."

78.    The *American Banker* exposé also discussed the Bank's "scandal-free" reputation, quoting outgoing CEO Davis in this context as stating, "'we walk a tightrope that's higher than any other bank, and we have no net . . . If we screw up, we're in trouble.'" Such efforts, the author noted:

> have made USB a regular on a list of the 'world's most ethical companies' published by Ethisphere. It is also the largest bank on the list.
>
> Tim Erblich, CEO of the Ethisphere Institute, said USB is ahead of most banking peers in recognizing the power of openness and ethical example-setting at the top. Employees take pride when their company tackles society's ills, such as a recent initiative for serving the unbanked. That, in turn, inspires loyalty and extra effort.
>
> "It's a *secret sauce* for success," Erblich said. "If employees trust the leadership, then your customers trust the employees and *it all trickles to the bottom line*. It's super-smart business."

79.    Quinn, the Company's Chief Administrative Officer and Managing Committee member in charge of strategy surrounding brand, reputation and culture, further commented in the exposé on the Bank's "different and unique culture," noting that two of the Bank's "five core values" included "'We do the right thing'" and "'We put people first.'" She also explained that USB's "three main business goals are embodied in the culture," including "to be customers' most trusted choice." Against this backdrop, the author concluded that, upon Cecere's elevation to CEO, "[m]aintaining USB's credibility will likely make [him] a success. Boosting revenue and the bottom line could make him a star[.]"

**G.**    **In Response to Congress's Probe of USB's Unlawful Conduct,**
**the Bank's CEO Admits Responsibility but Misleadingly Attempts to**
**Downplay Its Significance**

80.    On August 4, 2022, just a week after the CFPB issued the Consent Order against U.S. Bank, the Senate Banking Committee sent a letter to defendant Cecere about the Consent Order, expressing its deep concern with the Bank's misconduct, particularly in light of the Wells Fargo fake accounts scandal. The committee highlighted the CFPB's findings that U.S. Bank utilized an incentive-compensation program to pressure employees to "engage[] in unlawful activity by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit," which "accrued fees and *increased profits*" and which the CFPB found "*violated federal consumer laws and violated individual consumers' control over their data privacy*." The Senate Banking Committee also requested detailed information from the Bank regarding the misconduct and stated that it "look[ed] forward" to Cecere's testimony at the Annual Wall Street Oversight Hearing in September 2022 (the "Oversight Hearing").

81.    On September 22, 2022, seven CEOs of the largest U.S. banks – Wells Fargo, Bank of American, JP Morgan Chase & Co., Citigroup, Trust Financial Corporation, The PNC Financial Services and USB – attended the Oversight Hearing. Each of the bank heads was asked whether his or her bank was opening unauthorized accounts, and all denied that such accounts were being opened except Cecere. Rather than continue to deny any wrongdoing as the Bank had done in connection with the Consent Order, Cecere *admitted* to the unlawful conduct: "*I take full responsibility that we did open up unauthorized bank accounts*. It was going back to 2010. It's unacceptable. *It's inconsistent with our principles and procedures as well as our ethics*."

Like Stumpf did with respect to Wells Fargo years earlier, Cecere attempted to downplay the impact of the misconduct and his disclosure by purporting to claim that the Bank only "identified 342 accounts over that time . . . against a population of 40 million opened accounts." But Cecere's testimony failed to provide any context for his improbable assertion and grossly misrepresented the extent of unauthorized accounts at the Bank.

82.    As an initial matter, Cecere's attempt to explain away over a decade of misconduct condoned and facilitated by senior management by suggesting that the unlawful activity at USB was infinitesimal was, according to the terms of the Consent Order itself, calculatingly and catastrophically deceptive. That is because, as explained above, the Consent Order specifies that *throughout* the 11-year Findings Period, USB's processes "were not reasonably designed to determine the full scope" of the misconduct. And for the first six years of the Findings Period – until 2016 – USB lacked *any* system for identifying unauthorized accounts as it relied on either: (1) consumers to self-identify improper conduct; or (2) consumers or employees to allege improper activity. But even when consumers or employees identified misconduct, USB "only recorded or investigated the allegations if the allegation was escalated *above* the bank-branch level," and according to the Consent Order, USB "was *aware* that many allegations were not escalated or recorded." So, while Cecere's testimony proclaimed that unauthorized accounts were hardly a problem at USB, it also obscured the true scope of unauthorized accounts affected by the Bank's misconduct, which continued for years after the CFPB launched its investigation.

83.    Furthermore, Cecere's testimony before Congress not only understated the real number and scope of unauthorized account openings, it omitted any detail about the requirements for determining whether an account was unauthorized, and failed to state whether the Bank was

capable of identifying accounts that bear indicia of non-authorization and how many such accounts there were. Cecere's testimony is likewise at odds with the fact that USB agreed to pay $37.5 million in connection with the CFPB's investigation into the Bank's unlawful activity – comparatively *more* than what Wells Fargo paid to the CFPB (when adjusting for company size based on revenue) for similar and universally-acknowledged egregious fraudulent conduct. USB undoubtedly would not have agreed to such a penalty had there only been 342 isolated incidents of unauthorized accounts opened over an 11-year period, which is the equivalent of a single unauthorized account opened in a single branch each year in each of the 28 states in which the Bank currently maintains branches, which is simply inconsistent with an agreement to pay an eight-figure settlement in connection with alleged wrongdoing. For comparison, in connection with Wells Fargo's $100 million penalty to the CFPB to resolve an analogous investigation of fake accounts, the company identified more than 3.5 million accounts impacted by improper and unlawful conduct. Indeed, while the Consent Order here acknowledges that the improper sales practices involved a "small percentage" of USB's new accounts, even if, for example, only 5% of new accounts were improperly opened or otherwise impacted by illicit activity, that amounts to *2 million accounts* using Cecere's own statistics.

### H.    Defendants Failed to Adequately Disclose USB's Illegal Business Practices or the CFPB Investigation to Investors

84.    Despite knowing of the illicit business practices at the Bank dating back to 2010, admitting that USB had in fact opened unauthorized accounts, being aware of the CFPB investigation of specific illegal activities for years and the fact that these activities were analogues to the catastrophic Wells Fargo fake accounts scandal, Defendants failed to publicly and timely disclose the existence of the investigation, the increasing likelihood of a settlement or

enforcement action being brought, or the nature of the illegal business practices at the Bank. To the contrary, in statements to investors during the Relevant Period, Defendants repeatedly spoke about how consumer trust, ethics and reputation were "differentiators" and provided the Bank with a competitive advantage, while omitting any mention of the CFPB investigation (or, later in the Relevant Period, inadequately disclosing the nature of and risk associated with the investigation) or the unauthorized accounts that Defendants used to boost the Bank's consumer business.

85.    Defendants also routinely highlighted USB's robust compliance and risk management practices, claiming, for example, that the Company's "risk management" was "[b]est in class" and a key "advantage[]." Cecere also stated that the Bank's "risk discipline" is a "*differentiator*[]." Another executive touted USB's "[b]est in class risk discipline" as a "competitive advantage," while yet another executive emphasized that "[a] strong risk culture is embedded in our corporate strategy and will continue to be *foundational* to our long-term success." Similarly, USB's Ethics Code claimed that "[i]ncentive gaming and aggressive, deceptive, unfair or abusive sales practices are prohibited," stated that employees could not "open bogus accounts, sell products and/or open accounts without a customer's affirmative consent, [or] falsify applications" and identified "[o]pening, closing or altering accounts without proper authorization" as "[p]rohibited account transactions."

86.    Even as the CFPB investigation and the use of unauthorized accounts were already known to them, Defendants purported to warn investors about the potential risk that "*any* of" the "pending examinations, inquiries and investigations . . . *could* lead to administrative or legal proceedings or settlements." But, they failed to disclose that USB and the Individual Defendants knew that the Bank's employees had been engaging in a host of illicit practices since

at least 2010, including practices analogous to the Wells Fargo fake account scandal. And while the Bank disclosed that it was the subject of a CFPB investigation into "consumer sales practices" later in the Relevant Period, it failed to disclose the nature of the practices at issue or the likelihood that a settlement or enforcement action would ensue.

87.    Despite these developments, Defendants failed to: (1) implement and maintain an adequate and effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain adequate and effective internal controls and corporate governance practices and procedures to oversee and monitor the internal controls and the material risks posed to the Company; (3) investigate and take action when presented with red flags of misconduct; (4) made materially false and misleading statements regarding the Company's business, operational and compliance policies that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made; and (5) continued to promote the Bank's reputation, trustworthiness, ethicality and superior risk management systems as "differentiators" that set USB apart from the competition and even provided it with a competitive advantage over its peers. Indeed, the Bank's public representations were a clear response to the scandals that preceded the onset of the Relevant Period.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE RELEVANT PERIOD

88.    During the Relevant Period, Defendants made false and misleading statements and material omissions concerning: (1) USB's trust, ethics and brand; (2) the Bank's risk environment and management; (3) the CFPB investigation; and (4) USB's Ethics Code. The Relevant Period begins on August 1, 2019, when USB's stock traded as high as $57.19.

A.  **Defendants' Misleading Statements and Material Omissions Regarding USB's Trust, Ethics and Brand**

89.    Throughout the Relevant Period, the Company highlighted the importance of its ethical culture, trustworthiness and brand to investors, including referencing many of these assets as differentiators to, or competitive advantages over, its competitors. USB's carefully cultivated corporate reputation and trust enabled the Company to significantly grow its brand, and Relevant Period statements about these topics served to further underscore the importance of these advantages to the Company.

1.    **USB's September 12, 2019 Investor Day Conference**

90.    On September 12, 2019, the Company filed a Current Report on Form 8-K to which Defendants appended as an exhibit presentation slides entitled "USB Investor Day" for the Company's Investor Day held that same day. Defendants Cecere, Dolan, and Quinn, along with other members of the Company's executive management team, presented during the Company's Investor Day.

91.    The presentation included the following slide, presented by defendant Cecere in a "Strategic Overview," entitled "Our Advantages," in which USB underscored its "***strong reputation rooted in trust and engagement***," as reflected in the following slide:

**Our Advantages**

   

**Best-in-class financial results and risk management.**
Track record of industry leading performance and the highest debt ratings in the world.

**A diverse mix of businesses and core financial products.**
Balance of customers and fee and non-fee based businesses.

**A strong reputation rooted in trust and engagement.**
Recognized inside and outside the bank for focus and action in areas that matter most.

**A clear strategy that we are executing effectively.**
Nimble yet clear so we can evolve in a rapidly changing environment.



92.     Cecere also presented a slide to investors explaining that "[w]e will keep what made us great," including "[o]ur culture," and explaining that "[c]ustomers and employees remain at the center of everything we do – past, present and future," as reflected in the following slide:



93.    Additionally, Cecere emphasized in slides during his presentation that "We Are Enhancing Our Capabilities to Compete in a New World," including by "[f]ocusing relentlessly on the customer," and that USB is "Positioned to Win" because the Bank's "reputation" is a "differentiator[]."

94.    Quinn, USB's Chief Administrative Officer, presented regarding the Company's "Brand and Culture," which she described as a "Source of *Competitive Advantage*," and which included "ethics," "trust," "respect," "customer transparency," "caring" and "honesty," among other things, as reflected in the following slide:





95.    Quinn also stated that "Brand Directly Impacts Every Major Constituency" and specifically identified employees, customers, communities and *shareholders* as the aforementioned constituencies, as reflected in the following slide:

**Brand Directly Impacts Every Major Constituency**

We bring our story to life in relevant ways across each group

   

| Employees | Customers | Communities | Shareholders |
|---|---|---|---|
| *Experience, purpose, rewards and engagement* | *Ethics, experience, products and services, relationships* | *Investment, partnerships, sponsorships* | *Consistent results, best-in-class returns* |



U.S. BANCORP  26

96.    In another slide, Quinn emphasized USB's "Strong Reputation," noting that "We maintain an '***Excellent Reputation***' score as defined by our community partners."

97.    Additionally, Quinn underscored in yet another slide that USB's "brand value" grew 55% since 2016, resulting in "Strengthened ***Most Trusted Choice*** positioning," and "Deepened relationships with existing customers," as reflected in the following slide:

43



98.    In another slide, Quinn stated that "Trust and Reputation Are Foundational to All Constituencies," and highlighted "Prioritizing and building 'trust' at moments that matter most," as reflected in the following slide:




**Trust and Reputation Are Foundational to All Constituencies**

Earning the right to be integral to their lives

Staying relevant with our brand

Prioritizing and building "trust" at moments that matter most

Driving social impact through our community and Diversity, Equity and Inclusion focus to create economic opportunity



99.     During the 2019 Investor Conference, and accompanying the slide presentation, USB executives spoke about the Company to investors, elaborating on the points and topics emphasized in the slides. Regarding the Company's priorities, Defendant Cecere stated:

> ***Number one, relentlessly focusing on the customer. Everything we do at the company is with the customer in the center and all of our capabilities around that.*** The way we think about product development, technology, service, operations, communications, we're looking at the customer at the core of what we do.

100.     Additionally, Quinn assured investors during the 2019 Investor Conference that:

> ***[b]rand and culture are differentiators for U.S. Bank and they are fundamental to how we run our business.*** When we met last year in 2016, we talked about how ***strong brands drive better shareholder return. They also drive higher top line growth and they outperform the S&P 500.*** I'll tell you today what we've done on our brand journey since then, where we're positioned and what's next for us.
>
> So increasingly, people are not just buying what you do, they're buying why you do it. So when we began our brand journey, we started from the inside out. We started with our culture, which is a unique combination of IQ and EQ and that is reflected in our purpose statement. We invest our hearts and minds to power human potential. The trend of culture is very important. So when you think about

45

the sea of black and white banking, this gray space is really, really important, the space of brand and culture. It unifies and rallies employees and it's why is felt across all of our stakeholders.

The ***intersection of brand and culture is differentiating***, and it is really the unwritten rule set in which all decisions are made inside the company, and where -- is felt to all of our stakeholders again and it's how we conduct business. We were at a leadership off-site this past summer and ***we asked our top 200 leaders what is the secret sauce of U.S. Bank***, and this is the word cloud that emerged from that. So for those of us who live and breathe it every day, it's no surprise that ***ethics, trust and collaboration rose to the top***.

*    *    *

***Ethics and trust rises to the #1 spot for all customer segments, both consumers and businesses.***

*    *    *

So we work on attracting, retaining and developing our relationships with both employees and customers. And we focus on 3 things: one, creating compelling journeys for them both. For example, personalizing their experiences with us; secondly, enhancing and enabling their digital lives. As Andy said, you'll hear the word digital throughout the day; and lastly, by establishing really deep and meaningful relationships with both. This helps us build our customer brand as well as our employee brand resulting again in revenue, retention and growth. ***Trust will remain a competitive advantage for us.*** It is not going anywhere. It is going to be a foundational driver, top driver of business in our industry.

101.    Timothy A. Welsh, the Company's Vice Chairman of Consumer Banking Sales &

Support, stated at the 2019 Investor Conference:

We're becoming -- we're trying to become central to the lives of our customers. That's important. What that means is that we're really valuable to our customers that they depend on us, that they think of us, that they have an emotional connection to us in ways that are really meaningful. We're not just a mortgage that they pay or an auto loan bill. If all that -- if that's all we are, then we're not doing anything to power their potential. So this concept of centrality is very important, and the core underlying element of it is the idea of engagement. What we're trying to do with our customers is engage with them as frequently as we can. Derek talked about this with the large tech companies. He highlighted the fact that they focus on time spent with them. That's an idea that we're trying to replicate, but we're trying to do it in a very important way. ***We want to interact with our customers a lot, but we want to make sure that every time we do, we are helpful to them. If we are helpful to them and they interact with us a lot, it will help us build trust, which Kate and Andy highlighted, is so central to what we're doing. So that's really the core.***

46

102.    James B. Kelligrew, USB's Vice Chairman of Corporate & Commercial Banking, stated the following at the 2019 Investor Conference: "Our *best-in-class risk discipline* and I would add to that *our strong ethical culture really resonates well with our client base* with U.S. as a really safe and dependable long-term relationship."

103.    The statements referenced above were false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above and by the CFPB, which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril. The statements referenced above regarding USB's brand and reputation are also false and misleading given that the then-undisclosed CFPB investigation into the Bank for the illicit business practices targeted misconduct that was strikingly similar to the misconduct at issue in the Wells Fargo fake account scandal that tarnished Wells Fargo's reputation beginning in 2016, thus putting Defendants on notice that USB's conduct was illegal and would likely tarnish the Bank's brand and reputation.

### 2.    2019 and 2020 Annual Reports

104.    On or around February 13, 2020, USB issued its 2019 Annual Report ("2019 Annual Report"), in which it highlighted the Bank's "strong reputation," noting that "*Our culture, brand and reputation are sources of competitive advantage for U.S. Bank and*

*differentiate us from our peers*.” USB further stated in the 2019 Annual Report that “Our brand value — the financial significance a brand carries — grew by 55% in the last three years[] in response to our efforts to build brand awareness and strategically market ourselves.” USB further stated: “**Our commitment to operating with ethics and integrity and our focus on building trust are in everything we do**, and we’re recognized for that work through accolades from organizations like The Ethisphere® Institute, Fortune®, Forbes® and DiversityInc®.” The page of the 2019 Annual Report reflecting these statements is set forth in material respect below:



105.    Furthermore, under a subheading in the 2019 Annual Report entitled, “**The most trusted choice**,” USB stated “**Doing the right thing is in the DNA of our culture**, and we work hard to earn the privilege of trust and the opportunity to deepen it. We grow by investing in and staying true to our ethical culture, risk and financial discipline and our commitment to keeping customers safe and secure.”

106.    Under a section of the 2019 Annual Report entitled, "Data science," USB stated: "Being a central part of our customers' financial lives means we manage a tremendous amount of data and assume the responsibility for the ethical use of it. We're focused on strategic decisions through centralized data and analytics and we've built a dedicated team of experienced professionals to distill and protect that data to benefit our customers in meaningful ways."

107.    On or around February 23, 2021, USB issued its 2020 Annual Report ("2020 Annual Report"), in which it stated: "There for everyone. '***We do the right thing' leads our core values***. The culture we built and nurture is the reason we were able to successfully navigate the events of 2020 and emerge even stronger. Our strength affords us the courage to be uncomfortable and examine areas where we can grow and implement meaningful change."

108.    Under a section of the 2020 Annual Report entitled, "Ethics and business conduct," USB stated: "Every business decision we make begins and ends with our commitment to ethics, to doing the right thing. ***Ethical behavior is at the core of our culture***. We know we need to work at it daily, in both big and small ways. At a time when our industry is experiencing rapid change and managing unprecedented challenges, our commitment to ethics is a powerful constant in our culture and is continually reinforced from the very top of our company."

109.    Under a section of the 2020 Annual Report entitled "Data protection and privacy," USB stated: "We are committed to protecting the confidentiality, integrity, availability and privacy of customer data. Through clear and easily accessible policies, we tell our customers and online visitors why we collect information from them, how we will use it, and with whom we will share it. We also provide ongoing education and training to our employees and partners to ensure there are clear expectations on implementing and maintaining security and privacy technology and processes that protect our customers."

49

110.    The statements referenced above were false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above and by the CFPB, which had been investigating USB q since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's Board and senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately or promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril.

111.    The statements referenced above discussing the Bank's data protection and privacy practices and policies are also false and misleading and omitted material facts because Defendants were aware of, but did not disclose, their knowledge that the Bank's practices did not adhere to the requirements of the FCRA, but rather encouraged and/or allowed the use of customers' credit reports without a permissible purpose, and without customers' permission, to facilitate opening unauthorized credit cards and lines of credit. The statements referenced above regarding USB's brand and reputation are also false and misleading given that the then-undisclosed CFPB investigation into the Bank for the illicit business practices detailed above targeted misconduct that was strikingly similar to the misconduct at issue in the Wells Fargo fake account scandal that tarnished Wells Fargo's reputation beginning in 2016, thus putting Defendants on notice that USB's conduct was illegal and would likely tarnish the Bank's brand and reputation.

### 3.    March 10, 2020 Proxy Statement

50

112.    On March 10, 2020, USB filed a Definitive Proxy Statement on Schedule 14A (the "2020 Proxy") with the SEC that described USB's "key sustainable and responsible business practices," including with respect to the Bank's customers, "protecting data" and "respecting privacy." With respect to the Bank's employees, the Company identified "[b]usiness ethics" as a key responsible business practice, noting that "[o]ur global ethics program is designed to give employees the information, tools and training they need to make the right choices, find guidance when they need it, and report concerns without fear of retaliation."

113.    The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's Board and senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril.

114.    The statements referenced above regarding the Bank's purported "key . . . responsible business practices" are also false and misleading and omitted material facts because Defendants were aware of, but did not disclose, their knowledge that the Bank's practices did not adhere to the requirements of the FCRA, but rather encouraged and/or allowed the use of customers' credit reports without a permissible purpose, and without customers' permission, to facilitate opening unauthorized credit cards and lines of credit. These statements are also false

51

and misleading and omitted material facts because, as later revealed by the Consent Order, the Bank's practices were not responsible given the illicit business practices detailed above, and because the CFPB ultimately required USB to submit for review a "comprehensive compliance plan" designed to ensure the Bank "complies with all applicable Federal consumer financial laws," including "policies and procedures to identify, manage, mitigate, and report risks and misconduct associated with sales- related behaviors."

### 4.   September 15, 2020, September 21, 2021 and December 8, 2021 Conferences

115.    On September 15, 2020, USB filed with the SEC a Current Report on Form 8-K to which Defendants appended as an exhibit presentation a slide entitled Barclays Global Financial Services Conference 2020. In it, defendants Cecere and Dolan presented a slide with the question, "What differentiates U.S. Bank?," to which these defendants answered in part, "Culture of 'doing the right thing' for all our stakeholders."

116.    On September 21, 2021, USB filed with the SEC a Current Report on Form 8-K to which Defendants appended as an exhibit presentation a slide entitled "USB to Acquire Union Bank from Mitsubishi UFJ Financial Group," in which the Company touted USB's "Culture rooted in 'doing the right thing' and supporting communities from a foundation of trust and ethics[.]"

117.    On December 8, 2021, USB filed with the SEC a Current Report on Form 8-K to which Defendants appended as an exhibit presentation a slide entitled "Goldman Sachs U.S. Financial Services Conference 2021," (the "2021 Goldman Conference") in which defendants Cecere and Dolan presented the following slide, proclaiming that USB's "***culture is rooted in 'doing the right thing***'":



118. The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's Board and senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril.

## 5.    "Most Ethical Company" Statements

119. Throughout the Relevant Period, USB consistently promoted and prominently highlighted to investors the Company's recognition as one of the "World's Most Ethical

Compan[ies]" and that USB is an otherwise ethical, socially responsible and/or admired company.

120.    In the 2019 Investor Day presentation slides discussed *supra*, the Company represented that it was selected to Ethisphere's "***World's Most Ethical Companies***" for 2019, and as one of "***Fortune World's Most Admired Companies***" for 2019.

121.    In various Current Reports on Forms 8-K filed with the SEC by the Company on October 16, 2019, November 13, 2019, December 10, 2019 and January 15, 2020, USB appended as exhibits press releases that stated that "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial and corporate, and investment services customers across the country and around the world as a trusted financial partner, a commitment recognized by the Ethisphere Institute naming the bank a ***2019 World's Most Ethical Company***."

122.    On February 25, 2020, USB issued a press release entitled "***U.S. Bank Named One of the 2020 World's Most Ethical Companies***," in which the Company highlighted its "ethical business practices," and noted that "The Ethisphere Institute recognizes U.S. Bank for the sixth consecutive year." In the press release, defendant Cerece was quoted as stating, "***Our commitment to doing the right thing is at the heart of everything we do***," and "I'm proud of the work our employees do every day to earn and keep the ***trust*** of our customers."

123.    In various Current Reports on Forms 8-K filed with the SEC by the Company on March 19, 2020, April 15, 2020, June 30, 2020, July 15, 2020, October 14, 2020, December 9, 2020, December 22, 2020, January 20, 2021 and January 27, 2021, USB appended as exhibits press releases and presentations stating that, "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial and corporate, and investment

services customers across the country and around the world as a trusted financial partner, a commitment recognized by the Ethisphere Institute naming the bank one of the 2020 World's Most Ethical Companies." USB's Current Reports on Forms 8-K submitted to the SEC on September 15, 2020 and October 14, 2020 appended as exhibits a press release and presentations that also highlighted that USB was "One of the 2020 World's Most Ethical Companies, Ethisphere Institute[.]"

124.    In Current Reports on Forms 8-K filed with the SEC on June 28, 2021, July 15, 2021, September 21, 2021, October 14, 2021 and December 16, 2021, USB appended as exhibits press releases and presentations stating, and/or otherwise stated, that "[t]he company has been recognized for its approach to digital innovation, social responsibility, and customer service, including being named one of the 2021 World's Most Ethical Companies and Fortune's most admired superregional bank." This statement also appeared in the Definitive Proxy Statement on Schedule 14A filed with the SEC on March 8, 2022 (the "2022 Proxy").

125.    In a statement in the opening of the Company's 2019 Annual Report, defendant Cecere referenced USB's selection as one of the "World's Most Ethical Companies" *three separate times* on the *very first page* of the report, including noting that, "We are committed to our communities and being a socially responsible corporate citizen. We are a Fortune® Most Admired Company, one of the Ethisphere® World's Most Ethical Companies®, among Forbes® best banks in America, and recognized in the DiversityInc® Top 50 for our focus on diversity, equity and inclusion." These statements contained on the first page of the 2019 Annual Report are contained in the following excerpt:



Fellow shareholders: As a leadership team at U.S. Bancorp, we are proud of our position in the industry. We are one of the largest banks in the United States with global reach through our trust and payments businesses.

We have a diverse mix of profitable businesses. We have a strong culture, an efficient operating platform and healthy customer loyalty scores. We are committed to our communities and being a socially responsible corporate citizen. We are a Fortune® Most Admired Company, one of the Ethisphere® World's Most Ethical Companies® among Forbes® best banks in America, and recognized in the DiversityInc® Top 50 for our focus on diversity, equity and inclusion. Our financial results continue to lead the industry; at the end of 2019 on a full-year basis, we were among the best in class in return on assets, return on equity and efficiency. We are also one of the highest-rated banks in the world.

It is clear we are doing well, and we are committed to building on this position of strength.

Our focus as we face 2020 is how to retain those attributes and use them as differentiators while recognizing that they, alone, are insufficient in a changing world.

"World's Most Ethical Companies" and "Ethisphere" names and marks are registered trademarks of Ethisphere LLC.

126.    The 2020 Proxy stated that USB was "Named one of the World's Most Ethical Companies by Ethisphere Institute in 2020, the sixth year in a row[.]"

127.    On April 21, 2020, at the USB Annual Shareholders Meeting, Defendant Cecere stated:

> We also continue to be recognized outside the company for our efforts to be one of the best banks in the world. Fortune Magazine named USB World's Most Admired Company, recognizing several of our attributes as most admired among all companies, not just banks as well as naming us the world's most admired superregional bank for the 10th year in a row.
>
> Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices, announced 135 companies, spanning 23 countries and 57 industries, and ***we were honored as a 2020 Most Ethical Company. USB was one of those for the sixth year in a row.***
>
> *          *          *
>
> I'm extremely proud of the strong team of leaders, our Board and our management team and the standard they set for more than 70,000 employees around the world. ***Everyone is intensely focused on meeting the financial needs and objectives of our customers as we operate in a culture rooted in ethics and integrity***.

56

128.    In the 2020 Annual Report, USB highlighted its inclusion as one of the Ethisphere® World's Most Ethical Companies®: "The Harris Poll ranked us as America's most essential bank during COVID-19. The Ethisphere® Institute named us to the list of World's Most Ethical Companies® for the seventh consecutive year."

129.    In USB's SEC filings on March 4, 2021 (Current Report on Form 8-K appending as an exhibit a press release), March 9, 2021 (Definitive Proxy Statement on Schedule 14A) and April 15, 2021 (Current Report on Form 8-K appending as exhibits a press release and 1Q21 Earnings Conference Call Presentation), the Company stated that "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial, corporate, and investment customers across the country and around the world as a trusted and responsible financial partner. This commitment continues to earn a spot on the Ethisphere Institute's World's Most Ethical Companies list[.]"

130.    In the April 15, 2021 press release appended to Form 8-K, the Company described itself as "Most Ethical" and stated that "*[f]or the seventh consecutive year, U.S. Bank has been named one of the World's Most Ethical Companies* by the Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices." The press release also highlighted the Company as "Most Admired" stating that "USB was ranked No. 1 in the Superregional Banks category for the eleventh straight year in Fortune magazine's annual World's Most Admired Companies list."

131.    The Company's Ethics Code, as of July 2021, (discussed more fully below) stated on the cover that the Bank was named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute.

132.    In the 2021 Goldman Conference, USB underscored that it was "Named one of the **World's Most Ethical Companies** by The Ethisphere Institute for 7 consecutive years[.]"

133.    In the 2022 Proxy, the Company included a section on "Conduct," stating: "We are deeply committed to maintaining the *highest standards of ethical conduct* that reflect our purpose and *core values*. In recognition of that commitment, for the seventh consecutive year, we were named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute."

134.    On April 14, 2022, USB filed a Current Report on Form 8-K and appended as an exhibit a press release discussing the Company's First Quarter 2022 results. Under the section "Most Ethical" the Company stated: "For the *eighth consecutive year, U.S. Bank has been named one of the World's Most Ethical Companies®* by the Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices. Ethisphere recognized 136 honorees spanning 22 countries and 45 industries. U.S. Bank is one of five honorees in the banking category. The award recognizes companies' dedication to integrity, sustainability, governance and community." The April 14, 2022 press release also stated that "[t]he company has been recognized for its approach to digital innovation, social responsibility, and customer service, including being named one of the 2022 World's Most Ethical Companies and Fortune's most admired superregional bank." The Company reiterated this statement in a press release appended as an exhibit to a July 15, 2022 Current Report on Form 8-K.

135.    The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants);

(ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril. Defendants' *repeated* statements referenced above discussing the Company's promotion of USB as one of the "World's Most Ethical Companies" and as an otherwise ethical, socially responsible and/or admired company are also false and misleading and omitted material facts because they created the misleading impression that the Company maintained the "highest standards of ethical conduct" and were disseminated to distinguish the Bank from its competitors in the industry and cement its industry-leading brand and reputational assets. As later revealed, however, the CFPB determined that the Company and its Board failed to: (1) implement and maintain an adequate and effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain adequate and effective internal controls and corporate governance practices and procedures to oversee and monitor the internal controls and the material risks posed to the Company; (3) investigate and take action when presented with red flags of misconduct; and (4) made materially false and misleading statements regarding the Company's business, operational and compliance policies; and (5) violated various consumer protection laws in connection with the illicit business practices detailed above.

### 6.    USB's "Ethics" Website Statement

136. USB has issued a statement on its website, currently available at https://www.usbank.com/about-us-bank/ethics.html, that has remained on the Company's website since at least as early as October 1, 2020, entitled "Ethics at U.S. Bank" and subtitled "Trust.," containing a statement by Defendant Cecere. In the webpage statement, Cecere communicates USB's "commitment to ***the highest ethical standards***," which he explains "is the foundation for our core values and guides every decision we make." Cecere also explains that USB's Ethics Code "shows us how to be ***the most trusted choice***," and that the Company's "***ethical leadership is driving the ways we're innovating to meet our customers' evolving expectations***." The full website statement maintained by USB throughout the Relevant Period in substantially similar form, is set forth below:

About U.S. Bank / Ethics

# Ethics at U.S. Bank

## Trust.

Relationships are the heart of our business. We build those relationships on trust-the trust each of us earns every day, through every interaction with our customers and the communities we serve.

Our commitment to the highest ethical standards is what makes that trust possible. This commitment is the foundation for our core values and guides every decision we make. It powers our ability to act as one U.S. Bank, no matter what part of the company we work in or where on the globe we sit.

Our Code of Ethics and Business Conduct shows us how to be the most trusted choice. Acting with integrity-and speaking up when we have concerns-is how we protect our customers and help them achieve their financial goals.

Our ethics program is designed to do one thing: give our 73,000 leaders and employees the training, tools and resources they need to do the right thing. Integrity has powered our business success for more than 150 years, and ethical leadership is driving the ways we're innovating to meet our customers' evolving expectations.

We understand our responsibility to earn our customers' trust every day. Our ethical culture powers our ability to do that.

Andy Cecere
Chairman, President and CEO

60

137.    The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril. Defendants' statements referenced above promoting the Bank's ethical behavior are also false and misleading and omitted material facts because they created the misleading impression that the Company was operating under the "highest ethical standards" and were disseminated to distinguish the Bank from its competitors in the industry and cement its industry-leading brand and reputational assets. As later revealed, however, the CFPB determined that the Company violated various consumer protection laws in connection with the illicit business practices detailed above.

**B.    Defendants' Misleading Statements and Material Omissions Regarding USB's Risk Environment and Risk Management**

138.    During the Relevant Period, USB issued generic, boilerplate representations regarding the risks it faced, stating the relevant risks as mere hypotheticals despite the fact that the Company was under investigation by the CFPB throughout the Relevant Period for the Company's violations of consumer protection laws and regulations.

139.    On August 1, 2019, USB filed with the SEC its 2Q19 10-Q for the period ending June 30, 2019. In its "Corporate Risk Profile," USB stated the following:

The Board of Directors, primarily through its Risk Management Committee, oversees performance relative to the risk management framework, risk appetite statements, and other policy requirements.

The Executive Risk Committee ("ERC"), which is chaired by the Chief Risk Officer and includes the Chief Executive Officer and other members of the executive management team, oversees execution against the risk management framework and risk appetite statements. The ERC focuses on current and emerging risks, including strategic and reputational risks, by directing timely and comprehensive actions. Senior operating committees have also been established, each responsible for overseeing a specified category of risk. The Company's most prominent risk exposures are credit, interest rate, market, liquidity, operational, compliance, strategic, and reputational . . . Compliance risk is the risk that the Company may suffer legal or regulatory sanctions, material financial loss, or loss to reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct. . .

The Company's Board and management-level governance committees are supported by a "three lines of defense" model for establishing effective checks and balances. The first line of defense, the business lines, manages risks in conformity with established limits and policy requirements. In turn, business line leaders and their risk officers establish programs to ensure conformity with these limits and policy requirements. The second line of defense, which includes the Chief Risk Officer's organization as well as policy and oversight activities of corporate support functions, translates risk appetite and strategy into actionable risk limits and policies. The second line of defense monitors first line of defense conformity with limits and policies, and provides reporting and escalation of emerging risks and other concerns to senior management and the Risk Management Committee of the Board of Directors. The third line of defense, internal audit, is responsible for providing the Audit Committee of the Board of Directors and senior management with independent assessment and assurance regarding the effectiveness of the Company's governance, risk management and control processes.

140.    The statements above were also repeated in substantially similar form in Forms 10-Q filed by USB on November 8, 2019, May 7, 2020, August 6, 2020, November 5, 2020, May 4, 2021, August 3, 2021, November 2, 2021 and May 3, 2022 (collectively, the "Relevant Period 10-Qs"); and the 2019 Annual Report, 2020 Annual Report and 2021 Annual Report issued by USB on or about February 25, 2022 ("2021 Annual Report" and collectively, "Relevant Period Annual Reports"); and Forms 10-K, each of which was signed by the

Individual Defendants who were then members of the USB Board and Dolan, and filed with the SEC on February 20, 2020 for the fiscal year ending December 31, 2019 ("2019 10-K"), February 23, 2021 for the fiscal year ending December 31, 2020 ("2020 10-K") and February 22, 2022 for the fiscal year ending December 31, 2021 ("2021 10-K" and, collectively, the "Relevant Period 10-Ks").

141.    The August 1, 2019 10-Q also identified the following risks, which also appear in substantially similar form in the other Relevant Period 10-Qs, Relevant Period 10-Ks and Relevant Period Annual Reports:

> **Operational Risk Management** Operational risk is inherent in all business activities, and the management of this risk is important to the achievement of the Company's objectives. Business lines have direct and primary responsibility and accountability for identifying, controlling, and monitoring operational risks embedded in their business activities. ***The Company maintains a system of controls with the objective of providing proper transaction authorization and execution***, proper system operations, proper oversight of third parties with whom it does business, safeguarding of assets from misuse or theft, and ensuring the reliability and security of financial and other data. . .

> **Compliance Risk Management** The Company ***may*** suffer legal or regulatory sanctions, material financial loss, or damage to its reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct, including those related to compliance with Bank Secrecy Act/anti-money laundering requirements, sanctions compliance requirements as administered by the Office of Foreign Assets Control, ***consumer protection*** and other requirements. ***The Company has controls and processes in place for the assessment, identification, monitoring, management and reporting of compliance risks and issues.***

142.    The Company's September 12, 2019, Investor Day conference included a slide presented by Defendant Cecere which emphasized USB's purported "Best-in-class financial results and risk management," as reflected in the slide above, *supra*. In another slide, Cecere stated that the Bank is "Positioned to Win," including because its "risk discipline" is a "***differentiator***."

143.    In the 2019 Annual Report, under a section entitled "Operations and Business Risk," USB stated in pertinent part:

> ***The Company relies on its employees, systems and third parties to conduct its business, and certain failures by systems or misconduct by employees or third parties could adversely affect its operations.*** . . .
>
> The Company could also incur losses resulting from the risk of fraud by employees or persons outside of the Company, unauthorized access to its computer systems, the execution of unauthorized transactions by employees, errors relating to transaction processing and technology, breaches of the internal control system and compliance requirements, and business continuation and disaster recovery. This risk of loss also includes the potential legal actions, fines or civil money penalties that could arise as a result of an operational deficiency or as a result of noncompliance with applicable regulatory standards, adverse business decisions or their implementation, and customer attrition due to potential negative publicity.
>
> *        *        *
>
> **The Company could face significant legal and reputational harm if it fails to safeguard personal information.** The Company is subject to complex and evolving laws and regulations, both inside and outside of the United States, governing the privacy and protection of personal information of individuals. The protected individuals can include the Company's customers, its employees, and the employees of the Company's suppliers, counterparties and other third parties. Ensuring that the Company's collection, use, transfer and storage of personal information comply with applicable laws and regulations in relevant jurisdictions can increase operating costs, impact the development of new products or services, and reduce operational efficiency. ***Any mishandling or misuse of the personal information of customers, employees or others by the Company*** or a third party affiliated with the Company ***could expose the Company to litigation or regulatory fines, penalties or other sanctions.***
>
> Additional risks could arise if the Company or third parties do not provide adequate disclosure or transparency to the Company's customers about the personal information collected from them and its use; any failure to receive, document, and honor the privacy preferences expressed by the Company's customers; any failure to protect personal information from unauthorized disclosure; or any failure to maintain proper training on privacy practices for all employees or third parties who have access to personal data. Concerns regarding the effectiveness of the Company's measures to safeguard personal information and abide by privacy preferences, or even the perception that those measures are inadequate, could cause the Company to lose existing or potential customers and thereby reduce its revenues. In addition, any failure or perceived failure by the Company to comply with applicable privacy or data protection laws and

regulations could result in requirements to modify or cease certain operations or practices, significant liabilities or regulatory fines, penalties, or other sanctions.

*    *    *

**Damage to the Company's reputation could adversely impact its business and financial results**. Reputation risk, or the risk to the Company's business, earnings and capital from negative public opinion, is inherent in the Company's business. ***Negative public opinion about the*** financial services industry generally or the ***Company specifically could adversely affect the Company's ability to keep and attract customers, investors, and employees and could expose the Company to litigation and regulatory action.*** Negative public opinion can result from the Company's actual or alleged conduct in any number of activities, including lending practices, cybersecurity breaches, failures to safeguard personal information, discriminating or harassing behavior of employees toward other employees or customers, mortgage servicing and foreclosure practices, compensation practices, sales practices, environmental, social, and governance practices and disclosures, regulatory compliance, mergers and acquisitions, and actions taken by government regulators and community organizations in response to that conduct.

*    *    *

**The Company's framework for managing risks may not be effective in mitigating risk and loss to the Company**. The Company's risk management framework seeks to mitigate risk and loss. The Company has established processes and procedures intended to identify, measure, monitor, report, and analyze the types of risk to which it is subject, including liquidity risk, credit risk, market risk, interest rate risk, compliance risk, strategic risk, reputation risk, and operational risk related to its employees, systems and vendors, among others. However, as with any risk management framework, there are inherent limitations to the Company's risk management strategies as there may exist, or develop in the future, risks that it has not appropriately anticipated or identified. In addition, the Company relies on quantitative models to measure certain risks and to estimate certain financial values, and these models could fail to predict future events or exposures accurately. The Company must also develop and maintain a culture of risk management among its employees, as well as manage risks associated with third parties, and could fail to do so effectively. If the Company's risk management framework proves ineffective, the Company could incur litigation and negative regulatory consequences, and suffer unexpected losses that could affect its financial condition or results of operations.

144.    The statements above were repeated in substantially similar form in the other Relevant Period Annual Reports and Relevant Period 10-Ks.

145.    In the 2019 Annual Report and repeated in substantially similar form in the other Relevant Period Annual Reports and Relevant Period 10-Ks, under a section entitled "Regulatory and Legal Risk," USB stated:

> **The Company is subject to extensive and evolving government regulation and supervision, which can increase the cost of doing business, limit the Company's ability to make investments and generate revenue, and lead to costly enforcement actions**. . . .
>
> **The Company is subject to significant financial and reputation risks from potential legal liability and governmental actions**. The Company faces significant legal risks in its businesses, and the volume of claims and amount of damages and penalties claimed in litigation and governmental proceedings against it and other financial institutions are substantial. Customers, clients and other counterparties are making claims for substantial or indeterminate amounts of damages, while banking regulators and certain other governmental authorities have focused on enforcement. As a participant in the financial services industry, it is likely that the Company will continue to experience a high level of litigation related to its businesses and operations in the future. . . Substantial legal liability or significant governmental action against the Company could materially impact its financial condition and results of operations or cause significant reputational harm to the Company, which in turn could adversely impact its business prospects. Also, the resolution of a litigation or regulatory matter could result in additional accruals or exceed established accruals for a particular period, which could materially impact the Company's results from operations for that period.

146.    The Company's 2019 10-K, contained generic, boilerplate representations regarding the risks it faced as an entity subject to consumer protection and CFPB oversight, stating, in relevant parts:

> *Consumer Protection Regulation* U.S. Bank National Association's retail banking activities are subject to a variety of statutes and regulations designed to protect consumers, including laws related to fair lending and the prohibition of unfair, deceptive, or abusive acts or practices in connection with the offer, sale, or provision of consumer financial products and services. These laws and regulations include the Truth-in-Lending, Truth-in-Savings, Home Mortgage Disclosure, Equal Credit Opportunity, Fair Credit Reporting, Fair Debt Collection Practices, Real Estate Settlement Procedures, Electronic Funds Transfer, Right to Financial Privacy and Servicemembers Civil Relief Acts. Interest and other charges collected or contracted for by banks are subject to state usury laws and federal laws concerning interest rates.

66

*Consumer Financial Protection Bureau* U.S. Bank National Association and its subsidiaries are subject to supervision and regulation by the CFPB with respect to federal consumer laws, including many of the consumer protection laws and regulations described above. The CFPB has undertaken numerous rule-making and other initiatives, including issuing informal guidance and taking enforcement actions against certain financial institutions. The CFPB's rulemaking, examination and enforcement authority has affected and will continue to impact financial institutions involved in the provision of consumer financial products and services, including the Company, U.S. Bank National Association, and the Company's other subsidiaries. These regulatory activities may limit the types of financial services and products the Company may offer, which in turn may reduce the Company's revenues.

147.    The statements above were repeated in substantially similar form in the 2020 10-K and 2021 10-K.

148.    The Relevant Period 10-Ks discussed the Company's "Corporate Risk Profile" and stated, in pertinent part:

> **Management regularly provides reports to the Risk Management Committee of the Board of Directors. The Risk Management Committee discusses with management the Company's risk management performance, and provides a summary of key risks to the entire Board of Directors, covering the status of existing matters, areas of potential future concern** and specific information on certain types of loss events. The Risk Management Committee considers quarterly reports by management assessing the Company's performance relative to the risk appetite statements and the associated risk limits, including. . .
>
> Operational and compliance risk, including losses stemming from events such as fraud, processing errors, control breaches, breaches in data security or adverse business decisions, as well as reporting on technology performance, and various legal and regulatory compliance measures[.]

149.    Appended as exhibits to the Relevant Period 10-Qs and Relevant Period 10-Ks were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein defendants Cecere and Dolan certified that the Relevant Period 10-Qs and Relevant Period 10-Ks fully comply with the requirements of §13(a) or §15(d) of the Securities Exchange Act of 1934 and the information contained therein fairly presents, in all material respects, the financial condition and results of operations of the Company.

150.    In the 2019 Annual Report, and repeated in material part in the 2020 Annual

Report, 2019 10-K and 2020 10-K, under a section entitled "Litigation and Regulatory Matters,"

USB stated:

> The Company is subject to various litigation and regulatory matters that arise in
> the ordinary course of its business. The Company establishes reserves for such
> matters when potential losses become probable and can be reasonably estimated.
> The Company believes the ultimate resolution of existing legal and regulatory
> matters will not have a material adverse effect on the financial condition, results
> of operations or cash flows of the Company. However, in light of the uncertainties
> inherent in these matters, it is possible that the ultimate resolution of one or more
> of these matters may have a material adverse effect on the Company's results
> from operations for a particular period, and future changes in circumstances or
> additional information could result in additional accruals or resolution in excess
> of established accruals, which could adversely affect the Company's results from
> operations, potentially materially.
>
> *            *            *
>
> **Regulatory Matters**. The Company is continually subject to examinations,
> inquiries and investigations in areas of heightened regulatory scrutiny, such as
> compliance, risk management, third-party risk management and consumer
> protection. . . . The Company is cooperating fully with all pending examinations,
> inquiries and investigations, any of which could lead to administrative or legal
> proceedings or settlements. Remedies in these proceedings or settlements may
> include fines, penalties, restitution or alterations in the Company's business
> practices (which may increase the Company's operating expenses and decrease its
> revenue).

151.    On June 4, 2021, Defendant Cecere presented at Bernstein's Strategic Decisions

Conference (the "Bernstein's Conference"). During the presentation, Defendant Cecere provided

the following commentary:

> Unidentified Analyst: The first one is around the regulatory environment. ***What's
> your sense of how things might evolve on regulation? And which areas of
> interest to the regulators these days are most relevant to U.S. Bank?***
>
> Andy Cecere: So I do think, as an industry, there's going to be continued focus,
> certainly on ESG. That's an area that we have a lot of focus on. . . . ***The other
> area, John, is in consumer protection, and consumer activities. And maybe I'll
> just comment on overdrafts because I know that's a very topical subject. We've
> been very focused on this for a number of years***. Our overdraft fees have been
> coming down, partly because we're sending notifications to customers to let them

68

know about situations, that given their spent habits and inflow history, they may result in an overdraft situation, and set of actions they can take to avoid that.

Unidentified Analyst: So Andy, to summarize then, you are giving customers more information and more choice and maybe a little bit more time to kind of choose how they want these things to be addressed and processed? \

Andy Cecere: Yes. It has been a focus for us for a while. . . .

152.    The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

153.    The statements referenced above are also false and misleading and omitted material facts because the Company issued generic, boilerplate representations regarding the risks it faced, stating the relevant risks as mere hypotheticals despite the fact that the Company was under investigation by the CFPB for years, including throughout the Relevant Period, regarding improper sales practices and violations of related consumer protection laws. Additionally, the statements referenced above contained in the September 2019 Investor Day conference are false and misleading because the Company described its risk management as "[b]est- in-class" and "risk discipline" as a "differentiator" despite severe deficiencies in the Company's risk management systems uncovered by the CFPB following its then-ongoing investigation, which determined that U.S. Bank knew that sales pressure was leading employees

to open unauthorized accounts going back to 2010. The statements referenced above and contained in the Bernstein's Conference presentation are additionally false and misleading because at the time defendant Cecere made the statements, he gave the false impression of the regulatory environment surrounding USB without discussing the ongoing and intensifying CFPB investigation and related implications for the Company, including that the nature of conduct being investigated – of which U.S. Bank was aware – was strikingly similar to conduct the CFPB found to be unlawful as part of the Well Fargo enforcement action.

154.    Furthermore, the statements referenced above contained in the 2019 10-K, 2020 10-K, 2019 Annual Report and 2020 Annual Report discussing existing regulatory matters are materially false and misleading because they failed to disclose that the Company had been the subject of an ongoing, years-long CFPB investigation relating to the Company's consumer sales practices and conduct in violating consumer protection laws and regulations, including the CFPA, TILA, TISA and FCRA. In fact, though the Company had been under investigation by the CFPB throughout the Relevant Period, investors were unaware of the investigation until the Company generally disclosed an investigation of the "Company's consumer sales practices" on May 4, 2021. Even then, such disclosures were devoid of any detail about the targeted sales practices. The statements referenced above are additionally materially false and misleading because USB represented the potential imposition of a settlement, fine or reputational damage as a mere hypothetical despite the fact that the Company knew of the improper conduct since 2010 and that such conduct resembled the same conduct for which Wells Fargo was fined in 2016.

C.    **Defendants' False and Misleading Statements and Omissions Regarding the CFPB Investigation**

155.    On May 4, 2021, USB filed its Q1 2021 Form 10-Q with the SEC, which states, in

pertinent part:

> The Company is continually subject to examinations, inquiries and investigations
> in areas of heightened regulatory scrutiny, such as compliance, risk management,
> third- party risk management and consumer protection. ***For example, the [CFPB]
> is investigating certain of the Company's consumer sales practices, and the
> Company has responded and continues to respond to the CFPB***. The Company
> is cooperating fully with all pending examinations, inquiries and investigations,
> any of which could lead to administrative or legal proceedings or settlements.
> Remedies in these proceedings or settlements may include fines, penalties,
> restitution or alterations in the Company's business practices (which may increase
> the Company's operating expenses and decrease its revenue).

156.    The statements above were repeated in material respect in the 2021 10-K and

Forms 10-Q filed with the SEC on August 3, 2021 and November 2, 2021.

157.    On May 3, 2022, the Company filed a Form 10-Q with the SEC for Q1 2022,

which stated in pertinent part:

> ***Regulatory Matters*** The Company is continually subject to examinations,
> inquiries and investigations in areas of heightened regulatory scrutiny, such as
> compliance, risk management, third-party risk management and consumer
> protection. For example, ***the [CFPB] has been investigating certain of the
> Company's consumer sales practices and is now considering a potential
> enforcement action***. The Company is engaged in discussions with the CFPB on
> this matter and does not believe an enforcement action is warranted, but there can
> be no assurance that these discussions will result in a resolution. The Company is
> cooperating fully with all pending examinations, inquiries and investigations, any
> of which could lead to administrative or legal proceedings or settlements.
> Remedies in these proceedings or settlements may include fines, penalties,
> restitution or alterations in the Company's business practices (which may increase
> the Company's operating expenses and decrease its revenue).

158.    The statements referenced above are false and misleading and omitted material

facts because Defendants failed to disclose: (i) the illicit business practices detailed above, and

by the CFPB which had been investigating USB since at least 2010 and necessitated the

intervention of corporate headquarters (including the involvement of the Individual Defendants);

(ii) that USB's senior management had knowingly failed to remediate these illicit business

practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril. The statements referenced above are also false and misleading and omitted material facts because they misleadingly indicate the mere possibility that certain of USB's unspecified sales practices *might* violate relevant laws and regulations or that the Company *may* be subject to a fine or penalty when, in fact, Defendants knew of the improper conduct since 2010 and that such conduct resembled the same conduct that the CFPB determined was unlawful in connection with the Wells Fargo enforcement action in 2016.

### D. Defendants' False and Misleading Statements and Omissions Regarding USB's Ethics Code

159.   In the 2019 10-K, 2020 10-K and 2021 10-K, USB stated: "[t]he Company has adopted a Code of Ethics and Business Conduct that applies to its principal executive officer, principal financial officer and principal accounting officer. The Company's Code of Ethics and Business Conduct can be found at www.usbank.com[.]"

160.   The Company's Ethics Code, as detailed in a July 2021 version of the code, was purportedly issued as a "guide to doing the right thing and living [the Bank's] core values." The Ethics Code applies to "everyone who works at U.S. Bank," including the Company's directors. The Ethics Code further stated: "[i]n the unlikely event a waiver to this Code is requested by an executive officer or director, it must be approved by the USB Board of Directors and promptly disclosed. The chief executive officer must approve any waivers of the Code for employees in writing."

161.    The Ethics Code contained an introductory statement from defendant Cecere and Senior Vice President, Global Chief Ethics Officer, Katie Lawler, that included the following comments:

- "Our commitment to ethics will always be our strength."

- "The things we say and do define who we are to those around us. Whether we are keeping our commitments, taking the high road, or looking for the right solution – not just the easy one, we are showing the world that we can be counted on for our ethics and integrity."

- "Our core values" . . . "We do the right thing. . . We put people first."

162.    The Ethics Code repeated the phrase, "We do the right thing," throughout the document. For example, in Section 1.0, entitled "We do the right thing," the Ethics Code stated in pertinent part: "***Our commitment to high ethical standards is the foundation of our purpose and core values***. Demonstrating our core values every day through our words and actions is how we ***strengthen our ethical culture, deliver a superior customer experience and elevate our brand***." Additionally, on the very last page of the Ethics Code, under a large header entitled, "We do the right thing," USB provided the following statement: "Our Code of Ethics and Business Conduct is our shared guidebook to operating with integrity. In every part of our business around the world, our ethical culture guides how we do what we do for our customers, communities and each other."

163.    In Section 3.0, entitled "Our customers and business partners," the Ethics Code provided: "Our customer relationships are built on ***trust***—trust we earn every day, through every interaction. ***We do what's best for our customers while protecting their interests*** and ours. Creating the best possible customer experience is another way we live our core values and strengthen our brand."

164.    In Section 3.3.2, entitled "Responsible marketing, sales and servicing activities," the Ethics Code provided in pertinent part, "When we have an experience that doesn't meet our standards, may not comply with the letter or spirit of the law or may create undue risk for our customers, we act promptly to do the right thing. *Sales always must be based on customer needs or requests—they should never be the result of efforts to promote products or services to meet incentive, sales or recognition goals*."

165.    In Section 3.3.2.1, entitled "Sales practices," the Ethics Code stated, in part, "*Incentive gaming and aggressive, deceptive, unfair or abusive sales practices are prohibited. You may not manipulate records, open bogus accounts, sell products and/or open accounts without a customer's affirmative consent, falsify applications* or skew results in any way for the benefit of yourself or other employees."

166.    In Section 4.0, entitled "Our shareholders," the Ethics Code stated, in part, "*Our reputation is our most valuable asset, and it's the cornerstone of our brand*. . ."

167.    The statements in above are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed above, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

168.    Defendants' statements referenced above about the Bank's ethics are also false and misleading and omitted material facts because they created the misleading impression that the Company operated under "high ethical standards" when in fact Defendants knew that the Company engaged in unlawful consumer sales and business practices for years as detailed above. Moreover, the statements referenced above about employee sales practices and services are false and misleading and omitted material facts because Defendants knew that USB's employees had engaged in abusive, aggressive, unfair, deceptive and unlawful sales practices in order to meet incentive, sales or recognition goals, including by opening accounts without a customer's affirmative consent and/or falsifying applications.

## VIII.    THE TRUTH IS REVEALED

169.    As set forth in above, investors learned the truth about USB's consumer sales practices when the CFPB issued the Consent Order on July 28, 2022 and identified numerous unlawful acts and practices performed by U.S. Bank and/or its employees, including: (1) the application and issuance of credit cards and lines of credit for customers without their knowledge and consent; (2) the use or procurement of consumer reports of consumers who were not seeking an extension of credit from or involved in any form of credit transaction, account review or account collection with the Company, where employees and the Bank had no other permissible purpose for the consumer reports it used or obtained; (3) the opening of consumer deposit accounts without consumers' knowledge and consent; and (4) creating sales pressure on its employees that led to employees opening credit cards, lines of credit, and deposit accounts without consumers' knowledge and consent. The CFPB found that U.S. Bank violated the TILA and its implementing regulation, Regulation Z; the FCRA; the TISA, and its implementing regulation, Regulation DD, 12 C.F.R. part 1030; and the CFPA. The CFPB also fined USB $37.5

million and ordered the Company to submit a compliance plan designed to ensure the Company's relevant conduct complies with all applicable federal consumer financial laws and the terms of the Order.

170.    Analysts quickly observed the negative implications for USB's stock, as Piper Sandler noted on July 28, 2022 with respect to the Consent Order, "this is obviously a *negative* and something the story could have done without . . . these are just headlines no investor likes to read, especially from such as [sic] highly regarded company," and explained that "[a]s for potential stock price ramifications, as one might expect, the shares are underperforming today" and the issue will likely "keep the stock in check for the time being." On July 29, 2022, Bank of America also tied the stock price decline to the news of the Consent Order when it reported that "USB shares underperformed peers by 400bp on Thursday after the bank entered a consent order with the Consumer Financial Protection Bureau (CFPB) tied to its sales practices between 2010-2020." Other analysts expressed concern about potential additional costs associated with the fallout from the Consent Order. JP Morgan stated that a "*[k]ey concern is cost of customer remediation and further fines similar to Wells Fargo*" given "the initial CFPB fine for Wells' fake account scandal was relatively small ($100 mil), [but] it led to billions of dollars in costs from customer and investor class-action law suits, and settlements with State Attorney Generals, the Department of Justice, and the SEC."

171.    On the news of the Consent Order, the price of USB stock declined $2.00, or 4% and closed at $46.12 on July 28, 2022. As a result of Defendant's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company and its shareholders have suffered significant damages.

## IX.    DEFENDANTS' INSIDER TRADING

172.    Certain of the Individual Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of Company common stock. Defendants Cecere, Dolan, Richard, and Quinn (the "Insider Selling Defendants") collectively sold 463,700 shares of their personally-held stock for proceeds of more than $26 million. These sales made by the Insider Selling Defendants during the Relevant Period were suspiciously large in quantity and timing and were inconsistent with their pre- and post-Relevant Period trading practices.

173.    Defendant Cecere sold 349,751 shares of his personally held stock for proceeds of $20,139,701 in November 2019 and April 2021 while in possession of material nonpublic information.

174.    Defendant Dolan sold 86,349 shares of his personally held stock for proceeds of $4,288,645 between November 2019 and April 2021 while in possession of material nonpublic information.

175.    Defendant Richard sold 2,600 shares of her personally held stock for proceeds of $154,986 in November 2019 while in possession of material nonpublic information.

176.    Defendant Quinn sold 25,000 shares of her personally held stock for proceeds of $1,536,750 in May 2021 while in possession of material nonpublic information.

177.    The shares sold by the Insider Selling Defendants during the Relevant Period were highly unusual in both amount (based on the sheer dollar value of shares sold) and timing (made during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose). All of the sales by the Insider Selling Defendants detailed above were made ***after*** the CFPB

77

investigation began and ***before*** the CFPB disclosed the full scope of the Bank's unlawful acts and practices to the investing public. And defendants Cecere and Dolan collectively sold over $11.5 million worth of stock shortly before USB's May 4, 2021 initial disclosure of the CFPB's investigation of the Company's "consumer sales practices."

178.    Accordingly, the Insider Selling Defendants were motivated to make materially false and misleading statements and conceal material adverse information from investors so that they could personally profit from the artificial inflation in the trading price of USB's common stock resulting from their false and misleading statements and omissions during the Relevant Period and before the truth of the CFPB Consent Order was disclosed to the investing public.

## X.    USB'S STOCK REPURCHASES DURING THE RELEVANT PERIOD

179.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $6.032 billion to repurchase approximately 107 million shares of its own common stock at artificially inflated prices from the fourth quarter of 2019 through the second quarter of 2022.

180.    According to the Form 10-Q the Company filed with the SEC on November 8, 2019, for the quarterly period ended September 30, 2019 (the "3Q 2019 10-Q"), during the third quarter of 2019, from August through September 2019, the Company purchased 3,815,073 shares of its common stock for approximately $208,760,795 at an average price of $54.72 per share.

181.    According to the Form 10-K the Company filed with the SEC on February 20, 2020, for the quarterly period ended December 31, 2019 (the "4Q 2019 10-Q"), during the fourth

quarter of 2019, the Company purchased 39,121,951 shares of its common stock for approximately $2,405,000,000 at an average price of $58.90 per share.

182.    According to the Form 10-Q the Company filed with the SEC on May 7, 2020, for the quarterly period ended March 31, 2020 (the "1Q 2020 10-Q"), during the first quarter of 2020, the Company purchased 31,678,774 shares of its common stock for approximately $1,683,093,262 at an average price of $53.13 per share.

183.    According to the Form 10-Q the Company filed with the SEC on August 6, 2020, for the quarterly period ended June 30, 2020 (the "2Q 2020 10-Q"), during the second quarter of 2020, the Company purchased 555,213 shares of its common stock for approximately $18,305,373 at an average price of $32.97 per share.

184.    According to the Form 10-Q the Company filed with the SEC on November 5, 2020, for the quarterly period ended September 30, 2020 (the "3Q 2020 10-Q"), during the third quarter of 2020, the Company purchased 226,664 shares of its common stock for approximately $8,257,370 at an average price of $36.43 per share.

185.    According to the Form 10-K the Company filed with the SEC on February 23, 2020, for the quarterly period ended December 31, 2020 (the "4Q 2020 10-Q"), during the fourth quarter of 2020, the Company purchased 391,883 shares of its common stock for approximately $16,850,969 at an average price of $43.00 per share.

186.    According to the Form 10-Q the Company filed with the SEC on May 4, 2021, for the quarterly period ended March 31, 2021 (the "1Q 2021 10-Q"), during the first quarter of 2021, the Company purchased 13,740,798 shares of its common stock for approximately $667,115,743 at an average price of $48.55 per share.

187.    According to the Form 10-Q the Company filed with the SEC on August 3, 2021, for the quarterly period ended June 30, 2021 (the "2Q 2020 10-Q"), during the second quarter of 202, the Company purchased 15,183,981 shares of its common stock for approximately $896,158,558 at an average price of $59.02 per share.

188.    According to the Form 10-Q the Company filed with the SEC on November 2, 2021, for the quarterly period ended September 30, 2021 (the "3Q 2021 10-Q"), during the third quarter of 2021, the Company purchased 81,091 shares of its common stock for approximately $4,705,711 at an average price of $58.03 per share.

189.    According to the Form 10-K the Company filed with the SEC on February 22, 2022, for the quarterly period ended December 31, 2021 (the "4Q 2021 10-Q"), during the fourth quarter of 2021, the Company purchased 617,481 shares of its common stock for approximately $35,832,422 at an average price of $58.03 per share.

190.    According to the Form 10-Q the Company filed with the SEC on May 3, 2022, for the quarterly period ended March 31, 2022 (the "1Q 2022 10-Q"), during the first quarter of 2022, the Company purchased 1,240,717 shares of its common stock for approximately $71,179,934 at an average price of $57.37 per share.

191.    According to the Form 10-Q the Company filed with the SEC on August 4, 2022, for the quarterly period ended June 30, 2022 (the "2Q 2022 10-Q"), during the second quarter of 2022, the Company purchased 309,698 shares of its common stock for approximately $16,429,479 at an average price of $53.05 per share.

192.    Thus, in total, during the Relevant Period, the Company overpaid for the repurchase of hundreds of millions of shares of own stock at inflated prices.

## XI.    DAMAGES TO THE COMPANY

193.    USB has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, USB has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

     a.   costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

     b.   substantial loss of market capital;

     c.   costs already incurred and to be incurred defending the Related Securities Action; and

     d.   any fines or other liability resulting from the Company's violations of federal law.

194.    In addition, USB has been seriously harmed by the amount it overpaid for its repurchases of its own common stock at artificially inflated prices during the Relevant Period.

195.    In addition, USB's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

196.    The wrongdoing complained of herein has irreparably damaged USB's corporate image and goodwill. For at least the foreseeable future, USB will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that USB's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

197.    Plaintiff brings this action derivatively in the right of and for the benefit of USB to redress injuries suffered, and to be suffered, by USB as a direct result of violations of federal securities laws by the Defendants. USB is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

198.    The Board of USB, at the time this action was commenced, consists of Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine, and related party non-defendants Colberg and Reynolds, a total of thirteen (13) individuals.

199.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the USB Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

200.    Each of the Director Defendants were responsible for implementing and maintaining an adequate and effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; implementing and maintaining adequate and effective internal controls and corporate governance practices and procedures to oversee and monitor the internal controls and the material risks posed to the Company; investigating and taking action when presented with red flags of misconduct; and reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the

Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

201.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**A. Demand is Futile as to Defendant Cecere Because of His**

   **Principal Professional Occupation as the Company's President and CEO**

202.    As an employee of USB, the Company provides Defendant Cecere with his principal occupation from which he receives substantial compensation. For the fiscal years 2019, 2020, 2021, and 2022, Defendant Cecere received $18,785,026, $16,752,753, $19,166,276, and $16,157,514 in total compensation, respectively. Thus, Cecere could not consider a demand for action that might require him to sue the directors who control his continued employment and/or fellow members of management with whom he works on a day-to-day basis. Furthermore, the Company does not claim that Defendant Cecere is an independent director and because his primary source of income and primary employment is his employment as President and CEO of USB and his professional reputation is inextricably bound to his role at USB. Defendant Cecere is incapable of acting independently and demand is futile upon him.

203.    Cecere authorized and signed the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

204.    Cerece benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the USB Board through the false and misleading statements and material omissions in the 2022 Proxy.

205.    Cerece, as a director of USB, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the internal controls and the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

206.    The CFPB's $37.5 million fine for USB's illegally exploiting consumers' personal data to open sham accounts for unsuspecting customers demonstrates the utter failure to implement, maintain and monitor an internal control system to prevent, detect, and remediate the legal violations admitted to by USB.

207.    Cerece, through his many years of experience in the financial sector, including serving at various leadership positions at USB, is thoroughly familiar with the Exchange Act, consumer finance law, and the rules and regulations promulgated thereunder regarding the protection of client information and funds. Despite this knowledge, Cerece ignored the violations of these laws, rules, and regulations and failed to take timely action.

208.    Cerece is neither independent nor disinterested. Any demand upon Defendant Cerece is futile and, thus, excused.

**B.    Demand is Futile as to Defendants Baxter, Buse,**

     **Ellison-Taylor, and Wine as Audit Committee Members**

209.    Demand is futile as to Defendants Baxter, Buse, Hernandez, Ellison-Taylor, and Wine (the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

210.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The responsibilities and purpose of the Audit Committee are set forth *supra*.

211.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

212.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.

213.    The Audit Committee Defendants failed to uphold their additional obligations as members of the Audit Committee, which included, *inter alia*, ensuring the implementation and effectiveness of the Code. As members of the Audit Committee, Baxter, Buse, Hernandez, Ellison-Taylor, and Wine had additional obligations to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee

85

Charter. In complete disregard of his obligations under the Audit Committee Charter, the Audit Committee members failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

214.    Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**C.    Demand is Futile as to Defendants Bridges, Ellison-Taylor,**

         **Mehdi, and Wiehoff as Public Responsibility Committee Members**

215.    Demand is futile as to Defendants Bridges, Ellison-Taylor, Mehdi, and Wiehoff (the "Public Responsibility Committee Defendants") as members of the Public Responsibility Committee for their knowing failure to fulfill their responsibilities.

216.    The Board of Directors adopted a Public Responsibility Committee Charter, setting forth the responsibilities of the Public Responsibility Committee. The responsibilities and purpose of the Public Responsibility Committee are set forth *supra*.

217.    Upon information and belief, in their capacity as members of the Public Responsibility Committee, the Public Responsibility Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

218.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Public Responsibility Committee, the Public Responsibility Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with

misleading information, the Public Responsibility Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Public Responsibility Committee Defendants cannot adequately independently consider a demand.

**D.**     **Demand is Futile as to Defendants Bridges, Cecere, McKenney,**

**Mehdi, and Wiehoff as Risk Management Committee Members**

219.    Demand is futile as to Defendants Bridges, Cecere, Kirtley, McKenney, Mehdi, and Wiehoff (the "Risk Management Committee Defendants") as members of the Risk Management Committee for their knowing failure to fulfill their responsibilities.

220.    The Board of Directors adopted a Risk Management Committee Charter, setting forth the responsibilities of the Risk Management Committee. The responsibilities and purpose of the Risk Management Committee are set forth *supra*.

221.    The Risk Management Committee regularly receives reports and discusses with management the Company's risk management performance, and provides a summary of key risks to the entire Board of Directors, covering the status of existing matters, areas of potential future concern and specific information on certain types of loss events. The Risk Management Committee considers quarterly reports by management assessing the Company's performance relative to the risk appetite statements and the associated risk limits, including: "litigation developments," "[o]perational and compliance risk, including . . . various legal and regulatory compliance measures" and "[s]trategic and reputation risk considerations, impacts and responses." In their roles on the Risk Management Committee, the Risk Management Committee Defendants were undoubtedly aware of the Bank's unlawful acts and practices described herein. The purview of the Risk Management Committee, and by extension these defendants, included overseeing execution of the risk management framework with a specific focus on current,

emerging and reputational risks and directing timely and comprehensive actions. Moreover, as detailed further below, the members of the Risk Management Committee would have been well aware of the material regulatory risk associated with the Company's sales practices in light of the Wells Fargo scandal and the CFPB's investigation.

222.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Risk Management Committee, the Risk Management Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Risk Management Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Risk Management Committee Defendants cannot adequately independently consider a demand.

### E.    Demand is Futile as to the Director Defendants For Additional Reasons

223.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

224.    Defendants Baxter, Bridges, Kirtley, McKenney, and Wine received more than $300,000 in 2022 in compensation in the form of fees and stock and option awards for his/her service as a director. This level of compensation exceeds the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2022 director

compensation report, the median director compensation per year at a large cap company like USB is $300,000. As such, these Directors earn materially more than an average director at a similarly sized company.

225.    Certain of the Director Defendants will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm their investments. As of March 7, 2023, Baxter held 26,186 shares of USB common stock, Bridges held 15,499 shares of USB common stock, Buse held 16,691 shares of USB common stock, Colberg held 1,193 shares of USB common stock, Dolan held 307,627 shares of USB common stock, Ellison-Taylor held 6,568 shares of USB common stock, Harris held 34, 633 shares of USB common stock, Hernandez held 61,057 shares of USB common stock, McKenney held 36,206 shares of USB common stock, and Mehdi held 16,691 shares of USB common stock. If any one of them admitted that USB, its directors, and officers engaged in misconduct, their investment would be substantially devalued. Further, their acknowledgement that executives at USB engaged in the wrongdoing alleged would be an acknowledgement that, as a major investor with long-term involvement in the Company and as a director, they either knew of the wrongdoing or utterly failed to properly oversee the Company's operations in compliance with her fiduciary duties.

226.    Upon information and belief, in their capacity as members of the Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

227.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC

throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

228.    Moreover, knowledge of the Bank's unlawful acts and practices detailed herein and in the Consent Order can also be inferred to the Director Defendants because the unlawful sales acts and practices involved a core business at the Bank – *i.e.*, the Bank's Consumer and Business Banking, which, for the fiscal year prior to the beginning of the Relevant Period (2018), for example, comprised 40% of the Bank's total net revenue, 84% of which was specifically attributed to consumer banking. Given the importance of the Company's consumer sales products and practices to the Company's business, as well as the importance of customer trust, reputation and the employee incentive program instituted and/or approved by executives at the highest levels of the Bank and designed to increase sales, knowledge of the Bank's improper sales practices can therefore be imputed to the Director Defendants.

229.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

230.    Lastly, as discussed herein, beginning in late 2016, the CFPB, along with a host of other regulators, determined that Wells Fargo illegally and secretly opened unauthorized deposit and credit card accounts, resulting in numerous lawsuits, settlements and fines. CFPB Director Cordray remarked at the time, "'***Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences.***'"

231.    The CFPB launched its investigation of USB at least as early as 2017, as detailed in public reports by *CNN* and other media outlets following issuance of the Consent Order, which stated that the investigation had been pending for over five years. The initiation of the CFPB investigation thus followed closely on the heels of the Wells Fargo revelations and focused on misconduct dating back to 2010. In fact, when USB's conduct came to light in 2022, CFPB Director Chopra stated that "[f]or over a ***decade***, U.S. Bank ***knew*** its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts." The CFPB investigation "found ***specific evidence*** that revealed that U.S. Bank was ***aware*** that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts."

232.    Given these circumstances, once similar conduct at Wells Fargo was exposed – and certainly by the time the CFPB launched its analogous investigation of USB – Defendants were well aware that similar unlawful practices at the Bank posed serious risk of damage to the USB's reputation, brand and image as the "most trusted choice" among major banks. Yet as the CFPB determined, the misconduct continued for years after the initiation of the investigation. Indeed, following the revelations in the Consent Order, a JP Morgan analyst noted that it is

"unclear to us why these practices were not completely stopped after 2016 when US Bancorp found these practices – it seems from the order they continued through 2020[.]"

233.    By the beginning of the Relevant Period, the CFPB investigation had been underway for at least two years, if not longer. As the Company later revealed in its May 4, 2021 Q1 10-Q, the CFPB was "investigating certain of the Company's consumer sales practices, and ***the Company has responded and continues to respond to the CFPB***" and "is ***cooperating fully*** with" the investigation. The following year, in the Company's May 3, 2022 Q1 10-Q, USB further revealed that the CFPB "has been investigating certain of the Company's consumer sales practices and is now considering a potential enforcement action," explained that the Company "does not believe an enforcement action is warranted, but there can be no assurance that these discussions will result in a resolution" and noted that "[t]he Company is cooperating fully with" the investigation. Thus, by the very nature of their roles as directors at the Company and involvement in the oversight of the Company's core operations and risk profile, the Director Defendants' knowledge of the above misconduct can reasonably be inferred given the Company's cooperation with and responsiveness to the CFPB.

234.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## XIII.    COUNT I
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

235.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

237.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

238.    Under the direction and watch of Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, Kirtley, McKenney, Mehdi, Wiehoff, and Wine, the 2022 Proxy failed to disclose that: (1) contrary to the 2022 Proxy's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; (2) the Individual Defendants violated the Code; and (3) the Director Defendants, all of whom solicited the 2022 Proxy, breached their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

239.    The 2022 Proxy was also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk

relating to the Company's core business, operations and prospects in relation to the conduct that occurred for over a decade of illegally exploiting consumers' personal data to open sham accounts for unsuspecting customers in violation of CFPA, TILA, TISA, and the FCRA.

240.    The Director Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy, including but not limited to, the re-election of the Director Defendants and Cecere and the approval of the Company's executive compensation plan (the "Plan").

241.    The false and misleading statement in the 2022 Proxy led Company shareholders to, inter alia: (1) elect the Director Defendants and Cecere to the Board, allowing them to continue breaching their fiduciary duties to the Company and (2) to approve the Plan.

242.    The Company was damaged as a result of the Director Defendants' and Cecere's material misrepresentations and omissions in the 2022 Proxy.

243.    Plaintiff on behalf of USB has no adequate remedy at law.

**XIV.    COUNT II**

**Against the Related Securities Action Defendants for
Contribution Under Section 10(b) of the Exchange Act, Rule
<u>10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act</u>**

244.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

245.    As a result of the conduct and events alleged above, USB has been named as a defendant in the Related Securities Action brought on behalf of USB shareholders in which it is a

joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

246.    Federal law provides USB with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286 (1993), USB has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling USB to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

247.    Accordingly, Plaintiff, on behalf of USB, hereby claims contribution against the Related Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with USB under Rule 10b-5, or if joined in such actions, would be liable for the same damages as USB.

248.    USB claims no right to indemnification under the federal securities laws in this count, but rather only claims contribution.

249.    Furthermore, the Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding USB. Not only is USB now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in the Related Securities Action, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon USB by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual

Defendants caused the Company to repurchase hundreds of millions of its own shares at artificially inflated prices, damaging USB.

250.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

251.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about USB not misleading.

252.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by USB.

253.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the scheme set forth herein and for the false and

misleading statements and/or omissions disseminated to the public through filings with the SEC.

254.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

255.    Plaintiff, on behalf of Disney, has no adequate remedy at law.

**A.  More Allegations Regarding The Related Securities Action Defendants**

256.    Throughout the Relevant Period, the Related Securities Action Defendants caused

the Company to issue false and misleading statements and/or omit material information in public

statements and/or Company filings concerning the Company's business and financial prospects.

These statements were materially misleading to persons who purchased USB securities during

the Relevant Period.

257.    The plaintiffs in the Related Securities Action allege that they relied, directly or

indirectly, upon these false statements and misleadingly omissive disclosures in purchasing USB

securities, and, as a result, suffered damages because value of their investments was distorted by

the false and materially omissive statements, and they purchased such securities at such distorted

prices.

258.    The damages suffered by said investors were caused by reason of the fact that (i)

they were induced to purchase said securities by the false and misleading statements alleged

herein, and (ii) the revelation of the true nature of the Company's business and prospects resulted

in the decrease in price of its securities, causing the value of shareholders investments to drop.

259.    The plaintiffs in the Related Securities Action were unaware of the false and

misleading nature of said statements and omissive disclosures.

97

260.    When the Related Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of USB, the Related Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

261.    Accordingly, the Related Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if USB were to be held liable in the Related Securities Action, the Related Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of USB.

**B.  The Related Securities Action Defendants Are Control Persons**

262.    In acting as alleged above, the Related Securities Action Defendants were acting as authorized agents of USB in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Related Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

263.    The Related Securities Action Defendants were "controlling persons" of USB within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Related Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Related Securities Action Defendants would be liable to it for contribution.

264.     Plaintiff hereby derivatively claims such right of contribution on behalf of USB.

## XV.    COUNT III
### Against the Individual Defendants for Breach of Fiduciary Duty

265.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

266.     The Individual Defendants owed and owe USB fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe USB the highest obligation of good faith, loyalty, and due care.

267.     The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to USB shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgement.

268.     In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while certain Individual Defendants engaged in lucrative insider sales, netting proceeds of over $26 million.

269.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused USB to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to

99

USB and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

270.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

271.    Plaintiff, on behalf of USB, has no adequate remedy at law.

## XVI.    COUNT IV

**Against the Insider Selling Defendants for Breach
of Fiduciary Duties for Insider Trading and Misappropriation of Information**

272.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

273.    The Insider Selling Defendants, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public. When they directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

274.    When The Insider Selling Defendants sold their USB stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of USB stock would be significantly lower. The Insider Selling Defendants timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating USB's non-public information.

275.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

276.    As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in the Company.

277.    Plaintiff has no adequate remedy at law.

XVII.    **COUNT V**
**Against the Related Securities Action Defendants for Unjust Enrichment**

278.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

279.    By their wrongful acts and omissions, the Related Securities Action Defendants were unjustly enriched at the expense of and to the detriment of USB.

280.    The Related Securities Action Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to USB.

281.    Plaintiff, as a shareholder and representative of USB, seeks restitution from the Related Securities Action Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Related Securities Action Defendants from their wrongful conduct and breaches of fiduciary duty.

282.    Plaintiff, on behalf of the Company, has no adequate remedy as a matter of law.

XVIII.    **COUNT VI**
**Against the Individual Defendants for Waste of Corporate Assets**

283.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

284.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

285.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; (c) repurchasing hundreds of millions of shares of the Company's own common stock at artificially inflated prices; and (d) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

286.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

287.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## XIX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action derivatively on behalf of USB and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to USB the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing USB and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect USB and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

> (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

> (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.      Determining and awarding to USB exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.      Awarding USB restitution from Defendants, and each of them;

F.      Awarding USB contribution from the Related Securities Action Defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## XX.    DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 16, 2023                Respectfully submitted,

                                      **BIELLI & KLAUDER, LLC**

                                      _/s/ Ryan M. Ernst_
                                      Ryan M. Ernst (#4788)
                                      1204 N. King Street
                                      Wilmington, DE 19801
                                      (302) 803-4600

OF COUNSEL:

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

_Attorneys for Plaintiff_